456 F.3d 1069
 Alexis Holyweek SAREI; Paul E. Nerau; Thomas Tamausi; Phillip Miriori; Gregory Kopa; Methodius Nesiko; Aloysius Moses; Rapheal Niniku; Gabriel Tareasi; Linus Takinu; Leo Wuis; Michael Akope; Benedict Pisi; Thomas Kobuko; John Tamuasi; Norman Mouvo; John Osani; Ben Korus; Namira Kawona; Joanne Bosco; John Pigolo; Magdalene Pigolo, individually and on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,
v.
RIO TINTO, PLC; Rio Tinted Limited, Defendants-Appellees.
Alexis Holyweek Sarei; Paul E. Nerau; Thomas Tamausi; Phillip Miriori; Gregory Kopa; Methodius Nesiko; Aloysius Moses; Rapheal Niniku; Gabriel Tareasi; Linus Takinu; Leo Wuis; Michael Akope; Benedict Pisi; Thomas Kobuko; John Tamuasi; Norman Mouvo; John Osani; Ben Korus; Namira Kawona; Joanne Bosco; John Pigolo; Magdalene Pigolo, individually and on behalf of themselves and all others similarly situated, Plaintiffs-Appellees,
v.
Rio Tinto, PLC; Rio Tinted Limited, Defendants-Appellants.
 No. 02-56256.
 No. 02-56390.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted September 8, 2003.
 Submission Withdrawn December 11, 2003.
 Reargued and Resubmitted June 23, 2005.
 Filed August 7, 2006.
 
 Steve W. Berman (argued), R. Brent Walton and Nicholas Styant-Browne, Hagens Berman Sobol Shapiro LLP; Paul N. Luvera, Jr. and Joel D. Cunningham, Luvera, Barnett, Brindley, Beninger & Cunningham, Seattle, WA; and Paul Stocker, Mill Creek, WA, for the plaintiffs-appellants/cross-appellees.
 James J. Brosnahan, Jack W. Londen (argued) and Peter J. Stern, Morrison & Foerster LLP, San Francisco, CA, and Charles E. Patterson, Morrison & Foerster LLP, Los Angeles, CA, for the defendants-appellees/cross-appellants.
 Sir Ninian M. Stephen, Melbourne, Australia, and Judge Stephen M. Schwebel, Washington, DC, as amici curiae in support of the defendants-appellees/cross-appellants.
 Appeal from the United States District Court for the Central District of California; Margaret M. Morrow, District Judge, Presiding. D.C. No. CV-00-11695-MMM.
 Before RAYMOND C. FISHER and JAY S. BYBEE, Circuit Judges, and JAMES C. MAHAN,* District Judge.
 FISHER, Circuit Judge.
 
 
 1
 This appeal presents questions of justiciability and exhaustion in the context of the Alien Tort Claims Act, 28 U.S.C. § 1350 ("ATCA"). Plaintiffs are current or former residents of Bougainville, Papua New Guinea ("PNG"), who allege that they or their family members were the victims of numerous violations of international law as a result of defendant mining corporation Rio Tinto, PLC's ("Rio Tinto") Bougainville mining operations and the 10-year civil conflict that followed an uprising at the Rio Tinto mine.[1] The plaintiffs appeal the district court's dismissal of their lawsuit seeking redress under the ATCA, which provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.
 
 
 2
 Although several different doctrines of justiciability are at issue here—the political question doctrine, the act of state doctrine and the doctrine of international comity—all in effect provide different ways of asking one central question: are United States courts the appropriate forum for resolving the plaintiffs' claims? The answer to this question turns in part on the weight to be given to a statement of interest submitted by the United States Department of State ("State Department") asserting that continuation of the lawsuit "would risk a potentially serious adverse impact . . . on the conduct of [United States] foreign relations." Rio Tinto's cross-appeal also argues that the ATCA requires exhaustion of local remedies—yet another way of questioning whether there is a different and more appropriate forum to develop and try these claims.
 
 
 3
 We conclude that most of the plaintiffs' claims may be tried in the United States. We hold that the district court erred in dismissing all of the plaintiffs' claims as presenting nonjusticiable political questions, and in dismissing the plaintiffs' racial discrimination claim under the act of state doctrine. We also vacate for reconsideration the district court's dismissal of the plaintiffs' United Nations Convention on the Law of the Sea ("UNCLOS") claim under the act of state doctrine, and its dismissal of the racial discrimination and UNCLOS claims under the international comity doctrine. Although Rio Tinto and amicus curiae have asserted several plausible rationales in support of an exhaustion requirement, we affirm the district court's conclusion that no such requirement presently exists, and leave it to Congress or the Supreme Court to alter the status quo if warranted.
 
 
 I. BACKGROUND
 
 
 4
 Because this case arises from a dismissal under Federal Rule of Civil Procedure 12(b)(6), we accept all facts alleged in the plaintiffs' complaint as true and construe them in the light most favorable to the plaintiffs. Transmission Agency v. Sierra Pac. Power Co., 295 F.3d 918, 923 (9th Cir.2002).
 
 
 5
 If plaintiffs' allegations are believed, the defendant Rio Tinto, an international mining company, with the assistance of the PNG Government, committed various egregious violations of jus cogens norms and customary international law including racial discrimination, environmental devastation, war crimes and crimes against humanity, with severe repercussions for many citizens of PNG.[2]
 
 A. The Bougainville Civil Uprising
 
 6
 Rio Tinto is an international mining group headquartered in London. During the 1960s, Rio Tinto sought to build a mine in the village of Panguna on Bougainville, an island province of PNG. Rio Tinto offered the PNG government 19.1 percent of the mine's profits to obtain its assistance in this venture.
 
 
 7
 Operations commenced in 1972. Each day, approximately 300,000 tons of ore and waste rock were blasted, excavated and removed from the mine, producing 180,000 tons of copper concentrate and 400,000 ounces of gold annually. The resulting waste products from the mine polluted Bougainville's waterways and atmosphere and undermined the physical and mental health of the island's residents. In addition, the islanders who worked for Rio Tinto, all of whom were black, were paid lower wages than the white workers recruited off island and lived in "slave-like" conditions.
 
 
 8
 In November 1988, Bougainvilleans engaged in acts of sabotage that forced the mine to close. Rio Tinto sought the assistance of the PNG government to quell the uprising and reopen the mine. The PNG army mounted an attack on February 14, 1990, killing many civilians. In response, Bougainvilleans called for secession from PNG, and 10 years of civil war ensued.
 
 
 9
 During the 10-year struggle, PNG allegedly committed atrocious human rights abuses and war crimes at the behest of Rio Tinto, including a blockade, aerial bombardment of civilian targets, burning of villages, rape and pillage. Plaintiffs assert that the war has ravaged the island and devastated its inhabitants. Thousands of Bougainville's residents have died; those who survived suffer health problems, are internally displaced and live in care centers or refugee camps or have fled the island.
 
 
 10
 The plaintiffs filed suit in federal district court seeking compensatory, punitive and exemplary damages, as well as equitable and injunctive relief on environmental contamination and medical monitoring claims, and attorney's fees and costs. They also seek disgorgement of all profits earned from the mine.
 
 
 11
 B. The State Department's Statement of Interest
 
 
 12
 After Rio Tinto moved to dismiss the first amended complaint, the district court, by letter dated August 30, 2001, sought guidance from the State Department "as to the effect, if any, that adjudication of this suit may have on the foreign policy of the United States."
 
 
 13
 On November 5, 2001, the State Department filed a statement of interest ("SOI"). After noting that the district court had not asked the United States to comment on the act of state and political question doctrines, the State Department reported that "in our judgment, continued adjudication of the claims . . . would risk a potentially serious adverse impact on the peace process, and hence on the conduct of our foreign relations," and that PNG, a "friendly foreign state," had "perceive[d] the potential impact of this litigation on U.S.-PNG relations, and wider regional interests, to be `very grave.'" Attached to the SOI was the PNG government's communique stating that the case "has potentially very serious social, economic, legal, political and security implications for" PNG, including adverse effects on PNG's international relations, "especially its relations with the United States."
 
 
 14
 The plaintiffs responded by submitting as offers of proof declarations from peace agreement participants stating that the agreement would not be affected by the litigation, and in fact would be strengthened. The plaintiffs later asked the State Department to "clarify" its submission to the court. The State Department on May 20, 2002 informed the district court that it "did not intend to file another statement of interest" in response.
 
 C. The District Court's Dismissal
 
 15
 The district court dismissed the first amended complaint in a comprehensive and thoughtful ruling on March 20, 2002. It issued an amended opinion on July 9, 2002. Sarei v. Rio Tinto, PLC, 221 F.Supp.2d 1116 (C.D.Cal.2002). The court found that the plaintiffs had stated cognizable ATCA claims for racial discrimination, crimes against humanity and violations of the laws of war, but that of the environmental claims, only the violation of the United Nations Convention on the Law of the Sea ("UNCLOS") was cognizable under the ATCA. Id. at 1139-1163. The court further held that if proven, the allegations supported liability against Rio Tinto for certain acts committed by the PNG government. Id. at 1148-49. The court, however, dismissed all of the plaintiffs' claims as presenting nonjusticiable political questions. Id. at 1193-1199. The court alternatively dismissed the racial discrimination and UNCLOS claims under the act of state doctrine and the doctrine of international comity. Id. at 1183-1193 (act of state); 1199-1209 (international comity). It also held that the ATCA did not require exhaustion. Id. at 1132-1139.
 
 
 16
 Prior to the dismissal, the plaintiffs sought leave to file an amended complaint. The district court denied their motion in the same judgment dismissing the complaint, finding that any such amendment would be futile.
 
 
 17
 D. Purported Change in the PNG Government's Position on the Litigation Since the District Court's Decision
 
 
 18
 The plaintiffs have asked that we take judicial notice of evidence suggesting that the PNG government no longer opposes the pursuit of this litigation because of a change in administration. In support of this claim, they offer:
 
 
 19
 1) A statement made on the parliament floor by Sir Michael Somare, the Prime Minister of PNG, that "[i]n my view . . . this is a litigation that has nothing to do with the United States Government or any investors . . . . Let the case proceed."
 
 
 20
 2) A letter dated February 6, 2003 from Joshua Kalinoe, Chief Secretary to the PNG Government, stating that "[w]hilst the complainants [in this case] are exercising their rights as citizens of [PNG], the Government does not support nor deny the constitutional rights of the citizens from taking whatever action they deem necessary."
 
 
 21
 3) A second letter from Kalinoe, dated March 30, 2005, reaffirming the position taken in his 2003 letter, stating, "The government is not a party to this case. Accordingly, it does not see the case presently before the courts affecting diplomatic and bilateral relations between our two countries nor does it see it affecting the peace process on the island of Bougainville."
 
 
 22
 4) A letter to the State Department dated January 8, 2005 from John Momis, the Interim Bougainville Provincial Governor, "urg[ing] the Government of the United States to support the Prime Minister's position to permit the case to proceed in the courts of America."
 
 
 II. DISCUSSION
 
 A. Subject Matter Jurisdiction
 
 23
 The district court held that the plaintiffs had properly alleged claims under the ATCA against Rio Tinto for violations of the laws of war, for crimes against humanity, for racial discrimination and for violations of the United Nations Convention on the Law of the Sea, and that Rio Tinto could be held liable for some actions of the PNG military. The district court also held that plaintiffs had failed to state ATCA claims for violations of the "right to life and health" and for environmental harm under the principle of "sustainable development." Neither party has expressly appealed these holdings, although Rio Tinto has noted its disagreement with the district court's failure to dismiss all claims on subject matter jurisdiction grounds.
 
 
 24
 Lack of subject matter jurisdiction is not waived by failure to object and may be raised at any time in the proceedings. See, e.g., United States v. Ceja-Prado, 333 F.3d 1046, 1049 (9th Cir.2003). Further, it is our responsibility as a court of limited jurisdiction to ensure that we have subject matter jurisdiction before proceeding further. Allstate Ins. Co. v. Hughes, 358 F.3d 1089, 1093 (9th Cir. 2004).[3]
 
 
 25
 We withdrew submission in this appeal to wait for the Supreme Court's opinion in Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), which we anticipated would clarify whether the plaintiffs' claims were cognizable under the ATCA. See Order Filed Dec. 10, 2003. In Sosa, the Supreme Court held that "courts should require any [ATCA] claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigm[ ]" causes of action for "offenses against ambassadors, violations of safe conduct . . . [and] piracy." Id. at 725, 720, 124 S.Ct. 2739 (internal citations omitted).[4] In doing so, it ratified the view of ATCA jurisdiction derived by the district court from Ninth Circuit precedent and applied in this case: "In evaluating plaintiffs' ATCA claims, therefore, the court must consider . . . whether they identify a specific, universal and obligatory norm of international law." Sarei, 221 F.Supp.2d at 1132. See also In re Estate of Ferdinand Marcos, Human Rights Litig., 25 F.3d 1467, 1475 (9th Cir.1994) (stating that the ATCA "creates a cause of action for violations of specific, universal and obligatory international human rights standards which confer fundamental rights upon all people vis-a-vis their own governments.") (internal citations and quotations omitted). The settled principles of law that governed the district court's analysis therefore remain sound post-Sosa. See Sosa, 542 U.S. at 748, 124 S.Ct. 2739 (Scalia, J., concurring in part, concurring in the judgment and dissenting in part) ("[T]he verbal formula . . . applied [by the Ninth Circuit to determine whether ATCA jurisdiction lies] is the same verbal formula that the Court explicitly endorses.").
 
 
 26
 We further agree with the district court's conclusion that the plaintiffs' claims for war crimes, violations of the laws of war, racial discrimination and for violations of the UNCLOS all implicate "specific, universal and obligatory norm[s] of international law" that properly form the basis for ATCA claims, Sarei, 221 F.Supp.2d at 1132, and that Sosa's gloss on this standard does not undermine the district court's reasoning. All of the plaintiffs' remaining claims, with the exception of the UNCLOS claim, assert jus cogens violations that form the least controversial core of modern day ATCA jurisdiction. See, e.g., Sosa, 542 U.S. at 729-30, 124 S.Ct. 2739 (endorsing approach of courts applying the ATCA to settled violations of the law of nations); Kadic v. Karadzic, 70 F.3d 232, 243 (2d Cir.1995) ("The District Court has jurisdiction pursuant to the Alien Tort Act over appellants' claims of war crimes and other violations of international humanitarian law.").
 
 
 27
 As for the UNCLOS claim, the treaty has been ratified by at least 149 nations, which is sufficient for it to codify customary international law that can provide the basis of an ATCA claim. See United States v. Alaska, 503 U.S. 569, 588 n. 10, 112 S.Ct. 1606, 118 L.Ed.2d 222 ("The United States . . . has recognized that [the UNCLOS's] baseline provisions reflect customary international law."); Lori F. Damrosch et al., International Law: Cases and Materials (4th ed.2001) at 1386 (most provisions of the UNCLOS "are clearly established customary law of the sea").
 
 
 28
 Another potential jurisdictional complication is the plaintiffs' efforts to hold Rio Tinto liable under theories of vicarious liability for alleged war crimes and crimes against humanity committed at its behest by the PNG army. A predicate question is whether, post-Sosa, claims for vicarious liability for violations of jus cogens norms are actionable under the ATCA. We conclude that they are. Courts applying the ATCA draw on federal common law, and there are well-settled theories of vicarious liability under federal common law. See, e.g., Moriarty v. Glueckert Funeral Home, Ltd., 155 F.3d 859, 866 n. 15 (7th Cir.1998) (deriving federal common law agency liability principles from the Restatement of Agency).[5]
 
 
 29
 The second question is whether the plaintiffs have sufficiently alleged Rio Tinto's liability for the PNG military's alleged war crimes. We agree with the district court that they have. The plaintiffs allege, for example, that "Rio Tinto knew that its wishes were taken as commands by the PNG government and Rio intended that its comments would spur the PNG forces into action," that "Rio . . . understood that . . . [i]f Rio did not direct and/or encourage a military response . . . none would have been initiated," and similar allegations that Rio Tinto officials exercised control over the behavior of PNG forces with regard to the conflict around the mine. 221 F.Supp.2d at 1148. Based on these allegations, the district court concluded that "plaintiffs have adequately alleged that PNG's actions are `fairly attributable' to Rio Tinto," and that "Rio Tinto `controlled' [PNG's] actions . . . ." Sarei, 221 F.Supp.2d at 1148. Taking the allegations of Rio Tinto's control over PNG forces as true, we agree with the district court that the plaintiffs have adequately alleged vicarious liability under the ATCA. Based on the plaintiffs' uncontested (for our purposes) allegations, we are satisfied that we have jurisdiction to proceed.[6]
 
 B. The Political Question Doctrine
 
 30
 The district court dismissed all of the plaintiffs' claims on the ground that they presented nonjusticiable political questions. We have recently observed that this inquiry "proceeds from the age-old observation of Chief Justice Marshall that `questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court.'" Alperin v. Vatican Bank, 410 F.3d 532, 544 (9th Cir.2005) (quoting Marbury v. Madison, 1 Cranch 137, 5 U.S. 137, 170, 2 L.Ed. 60 (1803)).
 
 
 31
 Courts considering the political question doctrine begin with the Supreme Court's elaboration of the appropriate analysis in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), where the Court described the doctrine as a function of the separation of powers, and set forth six factors that require the dismissal of a suit under the political question doctrine if any one of them is "inextricable from the case at bar." 369 U.S. at 217, 82 S.Ct. 691. Four are at issue here:
 
 
 32
 1. "a textually demonstrable constitutional commitment of the issue to a coordinate political department";
 
 
 33
 * * *
 
 
 34
 4. "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government";
 
 
 35
 5. "an unusual need for unquestioning adherence to a political decision already made"; or
 
 
 36
 6. "the potentiality of embarrassment from multifarious pronouncements by various departments on one question."
 
 
 37
 Id.[7] In the context of foreign relations, "[n]ot only does resolution of such issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand single-voiced statement of the Government's views." Id. at 211, 82 S.Ct. 691.
 
 
 38
 The district court dismissed all of the plaintiffs' claims because it concluded that the fourth and sixth Baker factors were present. Sarei, 221 F.Supp.2d at 1197-98. Rio Tinto asserts that the first and fifth Baker factors are also present; the plaintiffs claim that none are present. We will address each in turn.
 
 
 39
 1. Factor One: Constitutional Commitment to Another Branch
 
 
 40
 In Alvarez-Machain v. United States, 331 F.3d 604 (9th Cir.2003), rev'd on other grounds, Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), we adopted the Second Circuit's holding that the resolution of claims brought under the ATCA has been constitutionally entrusted to the judiciary. Alvarez-Machain, 331 F.3d at 615 n. 7 (citing and quoting Kadic, 70 F.3d at 249 ("The department to whom this [tort suit] has been constitutionally committed is none other than our own—the Judiciary.")); see also Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 48 (2d Cir.1991) (same); Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 797 (D.C.Cir.1984) (Edwards, J., concurring) ("[I]n implementing section 1350, courts merely carry out the existing view of the legislature that federal courts should entertain certain actions that implicate the law of nations."); Restatement (Third) of the Foreign Relations Law of the United States § 111(2) (1987)[hereinafter Foreign Relations Law Restatement] (cases arising under international law are within the judicial power of the United States).
 
 
 41
 When the Supreme Court reversed our en banc decision in Sosa, it did not question our conclusion that ATCA suits are constitutionally entrusted to the judiciary; it simply determined that the specific claim at issue was not cognizable under the ATCA. To the extent that Rio Tinto seeks to argue that the first Baker factor is satisfied as to all ATCA claims, or relies on a logic that itself derives from such a view, the argument fails. Given that plaintiffs have properly alleged cognizable ATCA claims, it is not tenable to insist that the claims themselves are not entrusted to the judiciary.
 
 
 42
 2. Factors Four, Five and Six: Interference With A Coordinate Branch
 
 
 43
 The fourth, fifth and sixth Baker factors are relevant in an ATCA case "if judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests." Kadic, 70 F.3d at 249. To determine whether these factors are present, we must first decide how much weight to give the State Department's statement of interest, which provided the basis for the district court's determination that the fourth and six factors were present.
 
 
 44
 
 a. Treatment of SOIs by Other Courts
 
 
 
 45
 The Second Circuit has stated that "an assertion of the political question doctrine by the Executive Branch, entitled to respectful consideration, would not necessarily preclude adjudication." Kadic, 70 F.3d at 250.[8] As for exactly how much weight to give such statements, two Second Circuit cases suggest that the executive statements should be reviewed for "arbitrariness." In National Petrochemical Co. of Iran v. M/T Stolt Sheaf, 860 F.2d 551, 555 (2d Cir.1988), the court found there was "no indication that[the SOI] is an arbitrary or ad hoc directive." Following Petrochemical, the court in Matimak Trading Co. v. Khalily, 118 F.3d 76 (2d Cir.1997), abrogated on other grounds by J.P. Morgan Chase Bank v. Traffic Stream, 536 U.S. 88, 122 S.Ct. 2054, 153 L.Ed.2d 95 (2002), recognized that an "unexplained change in stance . . . might under different circumstances require further inquiry of its ulterior motives," but that "no reason is apparent . . . for refusing to defer to the State Department in this case." 118 F.3d at 82 (citing Petrochemical for proposition that "court might boggle at `ad hoc, pro hac vice' directive of the government").
 
 
 46
 More recently, in Ungaro-Benages v. Dresdner Bank AG, the Eleventh Circuit found an ATCA suit justiciable despite a SOI from the government disapproving of the suit, and noted, "This statement of interest from the executive is entitled to deference . . . . A statement of nation interest alone, however, does not take the present litigation outside of the competence of the judiciary." 379 F.3d 1227, 1236 (11th Cir.2004).[9] And we recently stated that if "the State Department express[es] a view [on whether a case presents a political question,] that fact would certainly weigh" in the court's determination. Vatican Bank, 410 F.3d at 556.
 
 
 47
 The Supreme Court in Sosa stated that "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy," Sosa, 542 U.S. at 733 n. 21, 124 S.Ct. 2739, and prior to Sosa, some courts found a nonjusticiable political question where the State Department had indicated that a judicial decision would impinge upon important foreign policy interests. See, e.g., 767 Third Ave. Assocs. v. Consulate General (Yugo.), 218 F.3d 152, 160-61 (2d Cir.2000); Occidental of Umm Al Qaywayn, Inc. v. Certain Cargo of Petroleum, 577 F.2d 1196, 1204 (5th Cir.1978); see also In re Nazi Era Cases Against German Defs. Litig., 129 F.Supp.2d 370, 380-83 (D.N.J.2001); Burger-Fischer v. Degussa AG, 65 F.Supp.2d 248, 281-85 (D.N.J.1999).
 
 
 48
 Guided by separation of powers principles, as well as the cases discussed above, we conclude that although we will give the view in the SOI "serious weight," Sosa, 542 U.S. at 733 n. 21, 124 S.Ct. 2739, it is not controlling on our determination of whether the fourth through sixth Baker factors are present. Ultimately, it is our responsibility to determine whether a political question is present, rather than to dismiss on that ground simply because the Executive Branch expresses some hesitancy about a case proceeding.
 
 
 49
 
 b. The 2001 State Department SOI in this Case
 
 
 
 50
 Although it is a close question, we conclude that the SOI submitted in this case, even when given serious weight, does not establish that any of the final three Baker factors is "inextricable from the case," Baker, 369 U.S. at 217, 82 S.Ct. 691.
 
 
 51
 The SOI begins by noting that the State Department has not been "invited" to comment on the applicability of the political question doctrine itself. It next states that "[i]n our judgment, continued adjudication of the claims . . . would risk a potentially serious adverse impact on the peace process, and hence on the conduct of our foreign relations."[10] The SOI concludes with the observation that "[t]he Government of Papua New Guinea . . . has stated its objection to these proceedings in the strongest terms," and that PNG "perceives the potential impact of this litigation on U.S.-PNG relations, and wider regional interests, to be `very grave.'"
 
 
 52
 We first observe that without the SOI, there would be little reason to dismiss this case on political question grounds, and therefore that the SOI must carry the primary burden of establishing a political question. There is no independent reason why the claims presented to us raise any warning flags as infringing on the prerogatives of our Executive Branch. As such, these claims can be distinguished from cases in which the claims by their very nature present political questions requiring dismissal. See, e.g., Vatican Bank, 410 F.3d at 562 (identifying nonjusticiable political question presented by claims regarding alleged war crimes of an enemy of the United States committed during World War II). The Supreme Court has been clear that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance," and that the doctrine "is one of `political questions,' not of `political cases'." Baker, 369 U.S. at 211, 217, 82 S.Ct. 691. Without the SOI, this case presents claims that relate to a foreign conflict in which the United States had little involvement (so far as the record demonstrates), and therefore that merely "touch[ ] foreign relations." Id. at 211, 82 S.Ct. 691.[11]
 
 
 53
 When we take the SOI into consideration and give it "serious weight," we still conclude that a political question is not presented. Even if the continued adjudication of this case does present some risk to the Bougainville peace process, that is not sufficient to implicate the final three Baker factors, which require "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government," "an unusual need for unquestioning adherence to a political decision already made" or "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." Baker, 369 U.S. at 217, 82 S.Ct. 691. The State Department explicitly did not request that we dismiss this suit on political question grounds, and we are confident that proceeding does not express any disrespect for the executive, even if it would prefer that the suit disappear.[12] Nor do we see any "unusual need for unquestioning adherence" to the SOI's nonspecific invocations of risks to the peace process. And finally, given the guarded nature of the SOI, we see no "embarrassment" that would follow from fulfilling our independent duty to determine whether the case should proceed. We are mindful of Sosa's instruction to give "serious weight" to the views of the executive, but we cannot uphold the dismissal of this lawsuit solely on the basis of the SOI.[13]
 
 
 54
 Our holding today is consistent with our recent dismissal of ATCA war crimes claims in Vatican Bank as presenting nonjusticiable political questions. There, a proposed class of Holocaust survivors sued the Vatican Bank (a financial institution connected to the Vatican) for its complicity in various war crimes of the Nazi-sympathizing Ustasha puppet regime in Croatia, including Vatican Bank's profiting from the Ustasha regime's theft of the class's property. 410 F.3d at 538. We concluded that "the claims for conversion, unjust enrichment, restitution, and an accounting with respect to lost and looted property are not committed to the political branches," whereas "the broad allegations tied to the Vatican Bank's alleged assistance to the war objectives of the Ustasha, including the slave labor claims, which essentially call on us to make a retroactive political judgment as to the conduct of the war . . . are, by nature, political questions." Id. at 548. We distinguished Kadic, another war crimes case, in which the Second Circuit had declined to find a political question: "[T]he claims in Kadic focused on the acts of a single individual during a localized conflict rather than asking the court to undertake the complex calculus of assigning fault for actions taken by a foreign regime during the morass of a world war." Id. at 562.[14]
 
 
 55
 We do not understand Vatican Bank as foreclosing the plaintiffs' claims that relate to the PNG regime's alleged war crimes, but instead read its holding to apply only to the narrower category of war crimes committed by enemies of the United States. Considering such claims would necessarily require us to review the acts of an enemy of the United States, which would risk creating a conflict with the steps the United States actually chose to take in prosecuting that war. See id. at 560 (expressing unwillingness to "intrude unduly on certain policy choices and value judgments that are constitutionally committed to the political branches . . . for we do not and cannot know why the Allies made the policy choice not to prosecute the Ustasha and the Vatican Bank.") (internal citations and quotation marks omitted).
 
 
 56
 Reading Vatican Bank to preclude any ATCA war crimes claims would work a major, and inadvisable, shift in our ATCA jurisprudence. It would create a clear circuit split with Kadic. And it would contradict Sosa, which confirmed the view of the ATCA contained in Kadic and other cases when it stated that "[f]or two centuries we have affirmed that the domestic law of the United States recognizes the law of nations. It would take some explaining to say now that federal courts must avert their gaze entirely from any international norm intended to protect individuals." Sosa, 542 U.S. at 729-30, 124 S.Ct. 2739 (internal citations omitted).
 
 
 57
 We hold that none of the plaintiffs' claims present nonjusticiable political questions. The district court's dismissal on that ground must be reversed.
 
 C. The Act of State Doctrine
 
 58
 The act of state doctrine prevents U.S. courts from inquiring into the validity of the public acts of a recognized sovereign power committed within its own territory. See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); Timberlane Lumber Co. v. Bank of America, 549 F.2d 597, 605-607 (9th Cir.1977) (recounting history of doctrine). The doctrine reflects the concern that the judiciary, by questioning the validity of sovereign acts taken by foreign states, may interfere with the executive's conduct of American foreign policy. W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., 493 U.S. 400, 404, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990). As a result, an action may be barred if (1) there is an "official act of a foreign sovereign performed within its own territory"; and (2) "the relief sought or the defense interposed [in the action would require] a court in the United States to declare invalid the[foreign sovereign's] official act." Id. at 405, 110 S.Ct. 701; see also Credit Suisse v. United States Dist. Court for Cent. Dist. of Cal., 130 F.3d 1342, 1346 (9th Cir.1997).
 
 
 59
 If these two elements are present, we may still choose not to apply the act of state doctrine where the policies underlying the doctrine militate against its application. The Supreme Court discussed three such policies in Sabbatino:
 
 
 60
 [1] [T]he greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it. . . . [2][T]he less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches. [3] The balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence.
 
 
 61
 Sabbatino, 376 U.S. at 428, 84 S.Ct. 923.
 
 
 62
 The district court dismissed the racial discrimination and UNCLOS claims under the act of state doctrine. Sarei, 221 F.Supp.2d at 1184-1193. The plaintiffs contend that the district court erred, whereas Rio Tinto argues that the district court should have dismissed the war crimes and violations of the laws of war claims as well.[15] The burden of proving acts of state rests on Rio Tinto. Liu v. Republic of China, 892 F.2d 1419, 1432 (9th Cir.1989) (citing Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 694-95, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); Republic of Philippines v. Marcos, 862 F.2d 1355, 1361 (9th Cir.1988) (en banc)).
 
 
 63
 The plaintiffs allege that PNG acted "at Rio's direction" and that Rio Tinto and PNG "conspired to commit . . . violations of customary international law." As a result, certain acts of PNG are at issue, even if PNG is not a named defendant. See, e.g., National Coalition Gov't of Burma v. Unocal, Inc., 176 F.R.D. 329, 352 (C.D.Cal. 1997). We must therefore first determine whether these acts were "official."
 
 
 64
 The district court reasoned that an official, noncommercial act of state was implicated in the racial discrimination and UNCLOS claims because
 
 
 65
 Rio Tinto conducted its mining activity pursuant to an agreement between its subsidiary, Bougainville Copper Limited, and the PNG Government. . . . Because PNG entered into the agreement, and codified it . . . in order to exploit its natural resources, it is clear that it was engaged in a "public and governmental" as opposed to a "private and commercial" function.
 
 
 66
 Sarei, 221 F.Supp.2d at 1186 (citing cases).[16]
 
 1. Racial Discrimination
 
 67
 We disagree with the district court's conclusion that the alleged racial discrimination constituted an official act which the act of state doctrine could insulate from scrutiny. Acts of racial discrimination are violations of jus cogens norms. See Siderman de Blake, 965 F.2d at 717 (noting that the Foreign Relations Law Restatement "identif[ies] jus cogens norms prohibiting . . . systematic racial discrimination"). The complaint alleges "systematic racial discrimination" and "policies of racial discrimination" in Rio Tinto's operation of the mine, and that race was a motivating factor in several of the other alleged abuses. These allegations, which must be accepted as true at this stage, constitute jus cogens violations. Therefore, because "[i]nternational law does not recognize an act that violates jus cogens as a sovereign act," Siderman de Blake, 965 F.2d at 718, the alleged acts of racial discrimination cannot constitute official sovereign acts, and the district court erred in dismissing these claims under the act of state doctrine.
 
 2. UNCLOS Violations
 
 68
 We agree with the district court that PNG's actions taken pursuant to the Copper Act to exploit its own natural resources are "public acts of the sovereign." See In re Estate of Marcos Human Rights Litig., 978 F.2d 493, 498 n. 10 (9th Cir. 1992). Further, although the UNCLOS codifies norms of customary international law, see supra Section II.A, it is not yet clear whether "the international community recognizes the norm[s] as one[s] from which no derogation is permitted." Siderman de Blake, 965 F.2d at 715 (internal quotations omitted). Without more, we cannot conclude that the UNCLOS norms are also jus cogens norms. Therefore, although the alleged UNCLOS violations represent violations of international law, the UNCLOS provisions at issue do not yet have a status that would prevent PNG's acts from simultaneously constituting official sovereign acts. We further agree with the district court that to adjudicate the UNCLOS claim would require a court to judge the validity of these official acts.
 
 
 69
 Having found that the alleged UNCLOS violations constituted official sovereign acts, the district court turned to Sabbatino to determine whether the act of state doctrine barred any further consideration. See Sabbatino, 376 U.S. at 428, 84 S.Ct. 923. The district court's application of the Sabbatino factors relied in part on the SOI's assertion regarding the potential impact of this case on United States foreign relations. See Sabbatino, 376 U.S. at 428, 84 S.Ct. 923 (identifying "implications . . . for our foreign relations" as one factor to consider in act of state analysis).
 
 
 70
 Because we have rejected the district court's reliance on the SOI in the context of the political question doctrine, we consider it prudent to allow the district court to revisit its reliance on the SOI in the act of state context. We have concluded that the SOI, even when given "serious weight," does not establish—on its own— the presence of any of the Baker factors. However, the act of state analysis, while related, is not identical to the political question analysis. A consideration of foreign policy concerns is one of several Sabbatino factors, and the SOI's foreign policy concerns are entitled to consideration, but only as one part of that analysis. Moreover, further factual development may be necessary to determine whether "the government which perpetrated the challenged act of state is [still] in existence." Sabbatino, 376 U.S. at 428, 84 S.Ct. 923. We therefore vacate the district court's UNCLOS act of state dismissal for reconsideration in light of our analysis of the SOI.[17]
 
 D. International Comity
 
 71
 Under the international comity doctrine, courts sometimes defer to the laws or interests of a foreign country and decline to exercise jurisdiction that is otherwise properly asserted. See, e.g., Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa, 482 U.S. 522, 544 n. 27, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987) ("Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states."); In re Simon (Hong Kong & Shanghai Banking Corp. v. Simon), 153 F.3d 991, 998 (9th Cir.1998) (citing Hilton v. Guyot, 159 U.S. 113, 163-64, 16 S.Ct. 139, 40 L.Ed. 95 (1895)). See also Sosa, 542 U.S. at 761, 124 S.Ct. 2739 (Breyer, J., concurring) (stressing that it is important for courts to ask "whether the exercise of jurisdiction under the AT[CA] is consistent with those notions of comity that lead each nation to respect the sovereign rights of other nations by limiting the reach of its laws and their enforcement").
 
 
 72
 "Declining to decide a question of law on the basis of international comity is a form of abstention, and we review a district court's decision to abstain on international comity grounds for abuse of discretion." JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V., 412 F.3d 418, 422 (2nd Cir.2005); see also Remington Rand Corporation-Delaware v. Business Systems, Inc., 830 F.2d 1260, 1266 (3d Cir.1987) ("Because the extension or denial of comity is discretionary, we review this issue by the abuse of discretion standard.").[18] The district court dismissed the plaintiffs' racial discrimination and UNCLOS claims under the comity doctrine. Sarei, 221 F.Supp.2d at 1207. The plaintiffs contest this finding, whereas Rio Tinto asserts that the district court should have dismissed the war crimes and violations of the laws of war claims under this doctrine as well.[19]
 
 
 73
 As a threshold matter, the parties disagree as to whether the district court applied the appropriate comity analysis. The plaintiffs argue that this circuit has interpreted Supreme Court precedent to require a predicate inquiry into whether a true conflict of law exists. See In re Simon, 153 F.3d at 999 (citing Hartford Fire Ins. Co. v. California, 509 U.S. 764, 798, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993)) (limiting the application of the international comity doctrine to cases in which "there is in fact a true conflict between domestic and foreign law."). Rio Tinto asserts that we consider a conflict of law as only one of several factors. The district court agreed with the plaintiffs, and assumed that a conflict was a predicate requirement. See Sarei, 221 F.Supp.2d at 1200-01. We agree with the district court, which followed Simon's clear statement.[20]
 
 
 74
 The district court based its finding of a conflict on PNG's Compensation (Prohibition of Foreign Proceedings) Act of 1995 ("Compensation Act"), which "prohibit[s] the taking or pursuing in foreign courts of legal proceedings in relation to compensation claims arising from mining projects and petroleum projects in Papua New Guinea." Sarei, 221 F.Supp.2d at 1201.[21] The district court reasoned that a conflict existed because, "[w]hile the ATCA vests jurisdiction in federal courts to hear plaintiffs' claims, the Compensation Act prohibits plaintiffs from filing the claims elsewhere than in PNG." Id. at 1201. This conclusion was not an abuse of discretion.
 
 
 75
 Given a conflict of laws, courts then look to the nonexhaustive standards set forth in Foreign Relations Law Restatement § 403(2) ("Section 403(2)"):
 
 
 76
 Whether exercise of jurisdiction over a person or activity is unreasonable is determined by evaluating all relevant factors, including, where appropriate:
 
 
 77
 (a) the link of the activity to the territory of the regulating state, i.e., the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;
 
 
 78
 (b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;
 
 
 79
 (c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;
 
 
 80
 (d) the existence of justified expectations that might be protected or hurt by the regulation;
 
 
 81
 (e) the importance of the regulation to the international political, legal, or economic system;
 
 
 82
 (f) the extent to which the regulation is consistent with the traditions of the international system;
 
 
 83
 (g) the extent to which another state may have an interest in regulating the activity; and
 
 
 84
 (h) the likelihood of conflict with regulation by another state.
 
 
 85
 See also cmt. b (explaining that the list of considerations in Section 403(2) is not exhaustive and "[n]ot all considerations have the same importance in all situations; the weight to be given to any particular factor depends upon the circumstances").
 
 
 86
 The district court concluded on the basis of the State Department's SOI that it would best serve the United States' interests to decline jurisdiction. See Sarei, 221 F.Supp.2d at 1205. In addition, it found that the first two Restatement factors weighed in favor of declining jurisdiction on the racial discrimination and environmental harm claims because (1) all the conduct complained of occurred in PNG; (2) all the plaintiffs but the lead plaintiff, Sarei, are PNG residents; and (3) Rio Tinto, although not a PNG resident, has conducted significant business in, and has strong ties to, PNG. Id. at 1206. Finally, it concluded that an additional factor counseled dismissing the environmental harms because such claims arise out of PNG's exploitation of its natural resources. See id.
 
 
 87
 The district court acted within its discretion in determining that it should decline to hear these claims on comity grounds. However, as with the district court's act of state dismissal of the UNCLOS claim, because we have rejected the district court's reliance on the SOI in the context of the political question doctrine, we again consider it prudent to allow the district court to revisit its reliance on the SOI in the comity context. Further factual development may also be warranted to determine whether and how the Restatement factors apply to these claims. We therefore vacate the district court's comity ruling for reconsideration in light of our analysis of the SOI.[22]
 
 
 88
 E. It Would Not Be Appropriate At this Time to Recognize an Exhaustion Requirement in the ATCA
 
 
 89
 The district court held that exhaustion of local remedies was not required under the ATCA. Sarei, 221 F.Supp.2d at 1139. It examined the text of the Torture Victims Protection Act of 1991 ("TVPA"), Pub.L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, historical and statutory notes), which expressly requires exhaustion, and determined that the TVPA's requirement did not mandate a similar one for the ATCA. See Sarei, 221 F.Supp.2d at 1132-38. The court also rejected Rio Tinto's contention that an exhaustion requirement should be read into the ATCA because such exhaustion is customary under international law. See id. at 1138-39. It concluded that the ATCA "is a creature of domestic law," and that the plain language of the statute did not require exhaustion. Id. at 1139.
 
 
 90
 Rio Tinto's cross-appeal urges that an exhaustion requirement should be read into the ATCA. Two international legal jurists, Sir Ninian M. Stephen and Judge Stephen M. Schwebel, have filed an amicus brief supporting Rio Tinto's position.
 
 
 91
 The Supreme Court in Sosa hinted that it might be amenable to recognizing an exhaustion requirement as implicit in the ATCA:
 
 
 92
 This requirement of clear definition is not meant to be the only principle limiting the availability of relief in the federal courts for violations of customary international law, though it disposes of this case. For example, the European Commission argues as amicus curiae that basic principles of international law require that before asserting a claim in a foreign forum, the claimant must have exhausted any remedies available in the domestic legal system, and perhaps in other fora such as international claims tribunals. We would certainly consider this requirement in an appropriate case.
 
 
 93
 Sosa, 542 U.S. at 733 n. 21, 124 S.Ct. 2739 (internal citations omitted).
 
 
 94
 Neither the Supreme Court nor any circuit court, however, has resolved the issue of whether the ATCA requires exhaustion of local remedies. This circuit has sustained the justiciability of ATCA claims, both before and after Sosa, without requiring exhaustion. See Alperin v. Vatican Bank, 410 F.3d 532, 544-58 (9th Cir.2005); In re Estate of Ferdinand Marcos, Human Rights Litig., 25 F.3d 1467, 1474-76 (9th Cir.1994). Recently, Judge Cudahy of the Seventh Circuit made these observations in an ATCA suit brought by Nigerians against a Nigerian general for alleged torture during the regime of a since-deposed military junta:
 
 
 95
 [I]ncorporating an implicit exhaustion requirement in the ATCA would have something to recommend it. Doing so would, among other things, bring the Act into harmony with both the provisions of the TVPA (with which it is at least partially coextensive) and with the acknowledged tenets of international law. And while not directly applicable to the ATCA, the TVPA scheme is surely persuasive since it demonstrates that Congress not only assumed that the exhaustion requirements imposed by customary international law were discernible and effective in themselves, but also that they should be reflected in U.S. domestic law. Considerations of equity and consistency also recommend this approach since otherwise American victims of torture would be bound by an exhaustion requirement under the TVPA and foreign plaintiffs could avoid such strictures by pleading under the ATCA.
 
 
 96
 This question is far from settled, however, and the Supreme Court's decision in Sosa, though suggestive, offers little guidance. While it recognizes the possibility of reading an exhaustion requirement into the ATCA, the Court states only that it "would certainly consider this [exhaustion] requirement in an appropriate case." 124 S.Ct. at 2766, n. 21. Other federal courts appear to be less receptive to the idea. In short, it is far from clear that, purely as a matter of United States jurisprudence, the ATCA contains any exhaustion requirement at all.
 
 
 97
 Enahoro v. Abubakar, 408 F.3d 877, 889-90 (7th Cir.2005) (Cudahy, J., dissenting in part) (footnotes omitted). Other courts have avoided the issue by finding that even if exhaustion were to apply to the ATCA, local remedies would in those cases be futile and therefore need not be exhausted. See, e.g., Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F.Supp.2d 289, 343 n. 44 (S.D.N.Y.2003); see also Enahoro, 408 F.3d at 892 (Cudahy, J., dissenting in part) ("There can be little doubt but that the legal remedies offered by the Nigerian courts were indeed ineffective, unobtainable, unduly prolonged, inadequate or obviously futile under any applicable exhaustion provisions.").
 
 
 98
 Congressional intent is of "paramount importance" to any exhaustion inquiry. Patsy v. Bd. of Regents, 457 U.S. 496, 501, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). Where Congress specifically mandates it, exhaustion is required. Coit Independence Joint Venture v. Fed. Sav. & Loan Ins. Corp., 489 U.S. 561, 579, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989); Patsy, 457 U.S. at 502 n. 4, 102 S.Ct. 2557. Congressional intent may be descried from the statutory language, legislative history or recent congressional activity. See Patsy, 457 U.S. at 502 & n. 4, 102 S.Ct. 2557. When Congress has not clearly required exhaustion, sound judicial discretion usually governs. See McGee v. United States, 402 U.S. 479, 483 & n. 6, 91 S.Ct. 1565, 29 L.Ed.2d 47 (1971); Porter v. Bd. of Trs., Manhattan Beach Unified Sch. Dist., 307 F.3d 1064, 1070 (9th Cir.2002) ("If a statute does not provide for exhaustion of administrative remedies, a district court may require exhaustion in the exercise of its discretion."). Although we have discretion, we may not create exhaustion requirements for "policy considerations alone . . . unless exhaustion is consistent with congressional intent." Knight v. Kenai Peninsula Borough Sch. Dist., 131 F.3d 807, 816 (9th Cir.1997) (quoting Patsy, 457 U.S. at 513, 102 S.Ct. 2557).
 
 1. Congressional Intent
 
 99
 
 a. Statutory Language
 
 
 
 100
 The ATCA simply provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. There is no dispute that the statute does not explicitly require exhaustion.
 
 
 101
 Rio Tinto, supported by amicus curiae, argues that the statute implicitly requires exhaustion because of the ATCA's use of the language, "in violation of the law of nations," and because exhaustion is customary in international law. This argument, adopted by the dissent, has some appeal. It would make recourse to other, less certain modes of analysis unnecessary. But for reasons we explain below, unlike our colleague in dissent, we are not persuaded.
 
 
 102
 
 b. Legislative History
 
 
 
 103
 There is complete silence in the ATCA's legislative history. See, e.g., IIT v. Vencap, Ltd., 519 F.2d 1001, 1015 (2d Cir.1975) (characterizing the ATCA as "a kind of legal Lohengrin . . . no one seems to know whence it came"); In re Estate of Marcos, 978 F.2d at 498 ("The debates that led to the Act's passage contain no reference to the Alien Tort Statute, and there is no direct evidence of what the First Congress intended it to accomplish."); Tel-Oren, 726 F.2d at 789 (Edwards, J., concurring) ("the legislative history offers no hint of congressional intent in passing the statute"). Therefore, an inquiry into the ATCA's legislative history is of little help.
 
 
 104
 As the dissent points out, however, only five years after Congress passed the ATCA, the United States negotiated and signed the Jay Treaty with Great Britain. Treaty of Amity, Commerce and Navigation (Jay Treaty), Nov. 19, 1794, U.S.-U.K., 8 Stat. 116. (Dissent at 9003.) Article VI of the Jay Treaty created an international arbitration procedure for pre-Revolutionary War debts claimed by British creditors against American debtors, but this mechanism could be invoked only if, "by the ordinary course of judicial proceedings, the British creditors cannot now obtain, and actually have and receive full and adequate compensation . . . ." 8 Stat. at 119. The dissent argues that Article VI, with its apparent similarity to the modern rule of exhaustion of local remedies, suggests that the First Congress was aware of the principle of exhaustion. But where does that leave us? It may mean that the absence of explicit exhaustion language in the ATCA was purposeful. See Edwards v. Aguillard, 482 U.S. 578, 594, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) ("The plain meaning of the statute's words, enlightened by their context and the contemporaneous legislative history, can control the determination of legislative purpose."). Put differently, the explicit exhaustion requirement in the Jay Treaty may reveal that the First Congress did not view exhaustion as an automatic rule of customary international law (or "the law of nations" as it was termed at the time). In the dissent's words, not only the 1991 Congress that passed the TVPA, but also the First Congress that passed the ATCA most likely knew "how to require exhaustion of remedies for torts `committed in violation of the law of nations or a treaty of the U.S.' when it wishe[d] to do so." (Dissent at 8996.) At best, a comparison between the text of the ATCA and that of the Jay Treaty is inconclusive. We therefore look to more recent pronouncements of congressional intent regarding a possible exhaustion requirement in the ATCA.
 
 
 105
 
 c. The TVPA
 
 
 
 106
 Congress' most recent statements regarding a federal cause of action for customary international law violations that occur outside the United States is found in the TVPA, enacted in 1991. The TVPA created an "unambiguous" cause of action for official torture and extrajudicial killing—both violations of customary international law—committed outside the United States. See H.R.Rep. No. 102-367 at 3 (1991), reprinted in 1992 U.S.C.C.A.N. 84, 86 ("The TVPA would establish an unambiguous and modern basis for a cause of action that has been successfully maintained under an existing law, section 1350 of the Judiciary Act of 1789 . . . .") (emphasis added).[23] Unlike the ATCA, the TVPA is available to aliens and U.S. citizens. See H.R.Rep. No. 102-367 at 4, reprinted in 1992 U.S.C.C.A.N. at 86 ("While the Alien Tort Claims Act provides a remedy to aliens only, the TVPA would extend a civil remedy also to U.S. citizens who may have been tortured abroad.").[24]
 
 
 107
 Most significantly for our purpose here, the TVPA contains the express exhaustion requirement that the ATCA does not. See 28 U.S.C. § 1350, historical and statutory notes, Torture Victim Protection, Section 2(b) ("A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred."). A House legislative report explains why a TVPA cause of action requires exhaustion, in terms that admittedly could apply to the ATCA as well:
 
 
 108
 The bill provides that a court shall decline to hear and determine a claim if the defendant establishes that the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred. This requirement ensures that U.S. courts will not intrude in cases more appropriately handled by courts where the alleged torture or killing occurred. It will also avoid exposing U.S. courts to unnecessary burdens, and can be expected to encourage the development of meaningful remedies in other countries.
 
 
 109
 H.R.Rep. No. 102-367 at 5, reprinted in 1992 U.S.C.C.A.N. at 87-88.[25]
 
 
 110
 In passing the TVPA, however, Congress did not discuss whether the ATCA, like the TVPA, should (or does) require exhaustion of local remedies. Rather, Congress simply stated generally that the ATCA provides "important uses and should not be replaced," H.R.Rep. No. 102-367 at 3, 1992 U.S.C.C.A.N. at 86, and that it "should remain intact." S.Rep. No. 102-249 at 5. Because Congress was obviously aware of the ATCA, it could have amended the statute to include an exhaustion requirement similar to the one contained in the TVPA. See Bates v. United States, 522 U.S. 23, 29-30, 118 S.Ct. 285, 139 L.Ed.2d 215 (1997) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.") (internal citations and quotations omitted). And if Congress understood that the ATCA already contained an exhaustion provision, it is not clear why it would add a superfluous exhaustion provision to the TVPA. See, e.g., Williams v. Taylor, 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ("[T]he cardinal principle of statutory construction [is] that courts must give effect, if possible, to every clause and word of a statute . . . .") (internal citations and quotations omitted).
 
 
 111
 On the other hand, the TVPA's legislative history suggests that Congress may have believed that exhaustion of local remedies was required in some situations where U.S. courts are faced with international law claims. See S.Rep. No. 102-249 at 10 ("[A]s this legislation involves international matters and judgments regarding the adequacy of procedures in foreign courts, the interpretation of section 2(b) [(requiring exhaustion)], like the other provisions of this act, should be informed by general principles of international law."). But upon closer inspection, that legislative history stops short of a broad and unambiguous statement that Congress believed that the satisfaction of the international exhaustion rule was required as a matter of U.S. domestic law before an ATCA claim could be heard in a U.S. court.
 
 
 112
 In attempting to glean congressional intent with respect to the ATCA from the TVPA's legislative history, we also note that Congress was targeting only the specific substantive claims of torture and extrajudicial killing: "Official torture and summary executions merit special attention in a statute expressly addressed to those practices." S.Rep. No. 102-249 at 5; H.R.Rep. No. 102-367 at 4, 1992 U.S.C.C.A.N. at 86. Further, the TVPA's exhaustion rule was tailor-made with those substantive international law violations in mind and, at least for some, was not expected to be a significant hurdle for torture victims:
 
 
 113
 Cases involving torture abroad which have been filed under the Alien Tort Claims Act show that torture victims bring suits in the United States against their alleged torturers only as a last resort. Usually, the alleged torturer has more substantial assets outside the United States and the jurisdictional nexus is easier to prove outside the United States. Therefore, as a general matter, the committee recognizes that in most instances the initiation of litigation under this legislation will be virtually prima facie evidence that the claimant has exhausted his or her remedies in the jurisdiction in which the torture occurred. The committee believes that courts should approach cases brought under the proposed legislation with this assumption.
 
 
 114
 S.Rep. No. 102-249 at 9-10 (emphasis added). It appears, then, that when addressing causes of action based on norms of customary international law, Congress has treated different kinds of substantive claims differently—a caution against importing an across-the-board exhaustion requirement into ATCA based on what Congress did in the TVPA.[26]
 
 
 115
 Like the First Congress' intent in passing the ATCA (especially when viewed in the context of the Jay Treaty's exhaustion requirement), so too Congress' intent and understanding in 1991 with respect to the ATCA is unclear. Congress may have affirmatively declined to add an exhaustion requirement to the ATCA while incorporating such a requirement in the TVPA. Or Congress may have intended or understood exhaustion to apply to international law-based causes of action across-the-board.[27] But given (i) the lack of express historical or contemporary congressional intent regarding exhaustion under the ATCA, (ii) Congress' recent pronouncement that the ATCA should remain "intact" and "unchanged" and (iii) Congress' specific focus in the TVPA on torture and extrajudicial killing, we cannot conclude that legislative intent supports importing an exhaustion requirement into the ATCA.[28] Therefore, we turn to whether we should import exhaustion into the ATCA as an exercise of judicial discretion.
 
 2. Judicial Discretion
 
 116
 Rio Tinto, amicus curiae and the dissent advance plausible though ultimately unconvincing arguments in favor of requiring exhaustion as an exercise of judicial discretion. The dissent in particular draws upon a plethora of doctrines and sources, making a best case scenario for reading exhaustion into the ATCA. With respect, we believe our colleague overstates the clarity of his case and underplays plausible counterarguments and real ambiguities in international and domestic law. Whether one finds the arguments for or against exhaustion more or less persuasive, however, we conclude that the balance tips against judicially engrafting an exhaustion requirement onto a statute where Congress has declined to do so, and in an area of international law where the Supreme Court has called for the exercise of judicial caution rather than innovation. See Sosa, 542 U.S. at 728, 124 S.Ct. 2739 ("These reasons argue for great caution in adapting the law of nations to private rights."). This is particularly so given the uncertainties we encountered in our previous discussion of legislative intent regarding the ATCA, because that intent constrains the exercise of our judicial discretion. Cf. Patsy, 457 U.S. at 513, 102 S.Ct. 2557 (holding that, in an administrative law setting, "policy considerations alone cannot justify judicially imposed exhaustion unless exhaustion is consistent with congressional intent").
 
 
 117
 The central argument Rio Tinto, amicus curiae and the dissent advance to justify exercising judicial discretion is that exhaustion of local remedies is an established aspect of international law. See Enahoro, 408 F.3d at 890 n. 6 (Cudahy, J., dissenting in part) (collecting sources); Interhandel (Switz v. U.S.), 1959 I.C.J. 6, 27 (Mar. 21); Foreign Relations Law Restatement § 703, cmt. d ("A state may pursue formal, bilateral remedies . . . only after the individual claiming to be a victim of a human rights violation has exhausted available remedies under the domestic law of the accused state. International agreements providing remedies to individuals also generally require that the individual first exhaust domestic remedies.") (internal citations omitted). But see Foreign Relations Law Restatement § 703, cmt. d ("The individual's failure to exhaust remedies is not an obstacle to informal intercession by a state on behalf of an individual, to unilateral `sanctions' by a state against another for human rights violations, or to multilateral measures against violators by United Nations bodies or international financial institutions."); id. § 713, cmt. b ("Formal diplomatic [protection] usually awaits exhaustion of local remedies, but governments often intercede informally without regard to the person's domestic remedies.") (internal citations omitted). Consequently, the "law of nations" language in the ATCA allegedly provides courts with the discretion to import an international law doctrine of exhaustion into an ATCA claim along with the substantive cause of action.
 
 
 118
 Moreover, the argument goes, not only would requiring exhaustion be consonant with international law, but such a requirement would address many of the policy concerns identified by the district court in its decision to dismiss some (or all) claims on political question, act of state and comity grounds. Finally, exhausting local remedies assumedly would encourage the development of effective local criminal and civil penalties for human rights violations.
 
 
 119
 However, this is a patchwork argument that on closer analysis is less cohesive and unambiguous than it is made out to be, as the following examples illustrate. First, the international law of exhaustion does not compel a U.S. court to apply it in an ATCA cause of action. Exhaustion, to the extent it may be a norm within international human rights law, was developed specifically in the context of international tribunals—such as the Human Rights Committee or the Inter-American Court of Human Rights—which were created through treaties and with the consent of sovereign countries. Even before exhaustion was written into human rights treaties, the norm evolved in the context of international fora and was based on assertions of national sovereignty. See Chittharanjan Felix Amerasinghe, Local Remedies in International Law 62 (2d ed. 2004) ("[T]he rule [of local remedies] seems to have become entrenched in response to insistence by host states on powers founded on sovereignty rather than because it emanated from a basic principle of justice inherent in the international legal order.").
 
 
 120
 Thus, the international norm of exhaustion does not speak to the hybrid situation before us where a domestic court in a sovereign country, rather than an international tribunal, is charged with adjudicating violations of customary international law through the vehicle of a civil suit. Although consideration of other countries' sovereignty is relevant to our inquiry here as it was in our earlier consideration of act of state doctrine and international comity, the exhaustion limitation imposed on and accepted by international tribunals as a requirement of international law is not dispositive as to a United States court's discretion to impose exhaustion as part of the ATCA.[29]
 
 
 121
 Second, the theory that the "law of nations" language in the ATCA provides a means by which the international law of exhaustion may be applied domestically overlooks that international exhaustion is procedural rather than substantive. See, e.g., Phosphates in Morocco (Italy v. Fr.), 1938 P.C.I.J. (ser.A/B) No. 74, at 28 (June 14) (holding that international responsibility for a substantive harm incurred upon one state by another attaches at the time of the act and not at a subsequent point after the injured state had been denied justice in the pursuit of local remedies); Amerasinghe, Local Remedies in International Law at 416 ("Judges or states may have made statements supporting the view that the [exhaustion] rule is substantive, but the practice of [international] judicial bodies relating to the rule leads overwhelmingly to the conclusion that the rule has not been treated as substantive or as both substantive and procedural but as solely procedural in character." (emphasis added)).
 
 
 122
 The substance-procedure distinction is important in this case because Sosa held that the ATCA "is a jurisdictional statute creating no new causes of action . . . [and was] enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time." 542 U.S. at 724, 124 S.Ct. 2739. None of the substantive definitions of international law violations in modern human rights treaties contain exhaustion as an element of such violations. To the extent the exhaustion requirement appears in such treaties, it appears separately as a general requirement. See, e.g., Optional Protocol to the International Covenant on Civil and Political Rights, art. 2, opened for signature Dec. 16, 1966, 999 U.N.T.S. 302 ("[I]ndividuals who claim that any of their rights enumerated in the Covenant have been violated and who have exhausted all available domestic remedies may submit a written communication to the [Human Rights] Committee for consideration."); (Dissent at 9005-9007 (collecting sources)). Sosa held that the ATCA provides jurisdiction for a violation of substantive norms comparable to "violation of safe conducts, infringement of the rights of ambassadors, and piracy." 542 U.S. at 724, 124 S.Ct. 2739.
 
 
 123
 The exhaustion rule is not like any of those, or modern substantive equivalents such as torture, extrajudicial killing, genocide, slavery, prolonged arbitrary detention and systematic racial discrimination. See Foreign Relations Law Restatement § 702 (cited with approval by Sosa, 542 U.S. at 737, 124 S.Ct. 2739). The Supreme Court has not addressed whether the methodology it employed in Sosa to identify some substantive international norms as falling within the ATCA's jurisdictional grant is applicable to procedural and other nonsubstantive customary law norms. Although importing exhaustion may serve the cautious ends advocated in Sosa, opening the door through the ATCA to other, nonsubstantive customary international law norms—such as universal jurisdiction—may be more problematic. See id. § 404 cmt. a ("[I]nternational law permits any state to apply its laws to punish certain offenses although the state has no links of territory with the offense, or of nationality with the offender (or even the victim). Universal jurisdiction over the specified offenses is a result of universal condemnation of those activities and general interest in cooperating to suppress them, as reflected in widely accepted international agreements and resolutions of international organizations. These offenses are subject to universal jurisdiction as a matter of customary law.").
 
 
 124
 Third, the argument that requiring exhaustion will improve compliance with international human rights law in other countries because it provides an incentive for those countries to improve their legal systems appears plausible on its face. (See Dissent at 1116-17.) Although advanced with some frequency, however, this argument remains fairly speculative and most often lacks any empirical data showing improvements in the quality or accessibility of local remedies as a result of the application of the local remedies rule at the international level. Cf. Ryan Goodman & Derek Jinks, Measuring the Effects of Foreign Human Rights Treaties, 14 Eur. J. Int'l L. 171, 182-83 (2003) ("Public international law desperately needs . . . studies that connect the law to events on the ground . . . . [W]e still do not satisfactorily know the full effects of human rights treaties."). An alternative and perhaps equally plausible hypothesis is that "[f]oreign court rulings against rights-abusing defendants have the effect of putting pressure `from above' on the state where the rights abuses occurred." Ellen Lutz & Kathryn Sikkink, The Justice Cascade: The Evolution and Impact of Human Rights Trials in Latin America, 2 Chi. J. Int'l L. 1, 4 (2001); see also id. at 24-25, 30 (discussing the possibility that the arrest and near trial of General Pinochet in Europe and European court cases against Argentine military officers were catalysts in Chile and Argentina, respectively, for more aggressive pursuit of human rights suits in those countries). If this alternative hypothesis were true, the absence of the exhaustion rule, not its presence, would contribute to the development of effective remedies for human rights abuses.[30]
 
 
 125
 Finally, and most importantly, notwithstanding there are policy reasons that favor judicially creating an exhaustion requirement for ATCA suits, such questions of policy bring us back to the legislative choice Congress could have easily made, but did not, in 1991 when it passed the TVPA and commented on the use and purpose of the ATCA.[31] Recognizing the delicate balance between judicial innovation and the "discretion of the Legislative and Executive branches in managing foreign affairs," Sosa, 542 U.S. at 727, 124 S.Ct. 2739, the Supreme Court pointedly said about the ATCA that it "would welcome any congressional guidance in exercising jurisdiction with such obvious potential to affect foreign relations . . . ." Id. at 731, 124 S.Ct. 2739; see also id. at 726, 124 S.Ct. 2739 ("[T]he general practice [has been] to look for legislative guidance before exercising innovative authority over substantive law."). Absent any clear congressional guidance on importing a blanket exhaustion requirement into the ATCA, Sosa counsels against doing so by judicial fiat—especially when Congress has not seen fit to do so when it had the opportunity.[32]
 
 
 126
 We therefore conclude that it would be inappropriate, given the lack of clear direction from Congress (either in 1789 or when it revisited the issue in 1991), and with only an aside in a footnote on the issue from the Supreme Court, now to superimpose on our circuit's existing ATCA jurisprudence an exhaustion requirement where none has been required before. See, e.g., Alperin v. Vatican Bank, 410 F.3d 532, 544-58 (9th Cir.2005); In re Estate of Ferdinand Marcos, Human Rights Litig., 25 F.3d 1467, 1474-76 (9th Cir.1994). Notwithstanding our dissenting colleague's scholarship, which goes far beyond what was presented in the briefs, we take the Supreme Court's admonition of caution in Sosa to heart and decline to read an exhaustion requirement into the ATCA, leaving it to Congress or the Supreme Court to take the next step, if warranted.[33]
 
 
 127
 F. Whether the District Court Properly Denied Leave to File an Amended Complaint Is Moot
 
 
 128
 Federal Rule of Civil Procedure 15(a) provides that a trial court shall grant leave to amend freely "when justice so requires." See Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) ("[T]his mandate is to be heeded."). "[L]eave to amend should be granted if it appears at all possible that the plaintiff can correct the defect." Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir.2000) (en banc) (internal citations and quotations omitted).
 
 
 129
 Given our conclusion that the dismissal of some of the plaintiffs' claims be reversed and the case remanded for further proceedings, the plaintiffs' appeal on this ground is moot. However, the plaintiffs should have an opportunity to file a new proposed amended complaint upon remand.
 
 
 III. CONCLUSION
 
 
 130
 We REVERSE the district court's dismissal of all claims as nonjusticiable political questions. We REVERSE the district court's dismissal of the racial discrimination claim on act of state grounds. We VACATE the district court's dismissal of the racial discrimination claim on comity grounds, and its dismissal of the UNCLOS claims on act of state and comity grounds, for reconsideration in light of this opinion. We AFFIRM the district court's conclusion that the ATCA does not contain an exhaustion requirement.
 
 
 
 Notes:
 
 
 *
 The Honorable James C. Mahan, United States District Judge for the District of Nevada, sitting by designation
 
 
 [1]
 The plaintiffs, who appear as appellants and cross-appellees in this appeal, will be referred to as "plaintiffs" throughout
 
 
 [2]
 A jus cogens norm "is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character."Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 714 (9th Cir.1992) (quoting Vienna Convention on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679).
 
 
 [3]
 If we were affirming the district court's dismissal on justiciability grounds, we could avoid this issue, as there is no violation of "the rule that a federal court may not hypothesize subject-matter jurisdiction for the purpose of deciding the merits" if the court affirms the district court without reaching the meritsHodgers-Durgin v. De La Vina, 199 F.3d 1037, 1042 n. 3 (9th Cir.1999) (en banc). However, because we reverse the district court's dismissal, we must ensure that jurisdiction lies.
 
 
 [4]
 The Supreme Court ultimately concluded that under this standard, the petitioner's claim for arbitrary arrest and detention was not cognizable under the ATCASosa, 542 U.S. at 737-38, 124 S.Ct. 2739.
 
 
 [5]
 We further note that violations of the law of nations have always encompassed vicarious liabilitySee 1 Op. Att'y Gen. 57, 59 (1795) (explaining that "jurisdiction [has been] expressly given to [United States] courts in all cases where an alien sues for a tort only, in violation of the laws of nations, or a treaty of the United States" and noting that "those who commit[ ], aid[ ], or abet[ ] hostilities" have "render[ed] themselves liable to punishment under the laws of nations"). Indeed, Congress passed a specific statute criminalizing aiding and abetting for one of the "paradigm" ATCA causes of action, piracy. See Act of April 30, 1790, ch. 9 § 10, 1 Stat. 114 (criminalizing aiding and abetting piracy).
 
 
 [6]
 We do not reach the separate question, which has not been presented to us on appeal, of what standard must govern such determinations of liability. Whether and how the plaintiffs will be able to prove their dramatic allegations are questions for another day
 
 
 [7]
 We do not address the second and thirdBaker factors, as Rio Tinto does not contend they are applicable.
 
 
 [8]
 As discussedinfra, the act of state doctrine also involves a determination of the political repercussions of judicial action, and in that context courts have held that statements of interest, although entitled to respect, are not conclusive. See Allied Bank Int'l v. Banco Credito Agricola de Cartago, 757 F.2d 516, 521 n. 2 (2d Cir.1985) ("This estimation [of the applicability of the act of state doctrine] may be guided but not controlled by the position, if any, articulated by the executive as to the applicability vel non of the doctrine to a particular set of facts. Whether to invoke the act of state doctrine is ultimately and always a judicial question."); Environmental Tectonics v. W.S. Kirkpatrick, Inc., 847 F.2d 1052, 1062 (3d Cir.1988) (holding that the State Department's legal conclusions "are not controlling on the courts," but that its "factual assessment of whether fulfillment of its responsibilities will be prejudiced by the course of civil litigation is entitled to substantial respect"). The Supreme Court also recently stated in the context of assertions of foreign sovereign immunity that "should the State Department choose to express its opinion on the implications of asserting jurisdiction over particular petitioners in connection with their alleged conduct, the opinion might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy." Republic of Austria v. Altmann, 541 U.S. 677, 702, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004) (emphasis in original omitted).
 
 
 [9]
 InUUngaro-Benages the court ultimately dismissed the claims on comity grounds. Id. at 1240.
 
 
 [10]
 The SOI adds that "[c]ountries participating in the multilateral peace process have raised this concern" as well
 
 
 [11]
 We address below the separate question of whether the act of state or international comity doctrines warrant dismissal due to a balancing of the interests of PNG and the United States
 
 
 [12]
 We need not determine whether a refusal to honor an explicit request to dismiss would constitute sufficient "disrespect" to warrant dismissal under this factor, although we note the Second Circuit's conclusion inKadic that it would not. Kadic, 70 F.3d at 250.
 
 
 [13]
 The plaintiffs have submitted recent letters from members of PNG's government urging that the suit willnot harm or affect the ongoing Bouagainville peace process. The Chief Secretary to the Government of PNG, Joseph Kalinoe, wrote to the United States Ambassador to PNG on March 30, 2005 that "the [PNG Government] does not see the case presently before the U.S. courts in the U.S. affecting diplomatic and bilateral relations between our two countries nor does it see it affecting the peace process on the island of Bougainville." And on January 8, 2005, John Momis, the Interim Bougainville Provincial Governor, wrote to the State Department's legal advisor under whose name the SOI was written, "urg[ing] the Government of the United States to support the Prime Minister's position to permit the case to proceed in the courts of America, and to explain that the people of Bougainville strongly desire the case to proceed in America. . . ." Momis' letter includes detail about the current state of the Bougainville peace process, and about how "the litigation has not hindered or in any way adversely affected the peace negotiations." Indeed, the letter adds that "the Sarei litigation has helped facilitate the process as it is viewed as another source of rectifying the historic injustices perpetrated against the people of Bougainville." Finally, the letter asserts that "the only way that the litigation will impact [U.S./PNG] foreign relations is if the litigation is discontinued."
 Whether these letters are properly authenticated is in dispute. But if they are authentic and their authors accurately describe the current state of affairs in PNG, that would seriously undercut the State Department's concerns expressed in its November 5, 2001 SOI—which itself depended on assessments by local government officials, including Joseph Kalinoe's predecessor as Chief Secretary to the Government of PNG. For whatever reason, the State Department has declined to update the SOI. Under these circumstances, we do not rely on the letters' substantive representations. But the letters, by suggesting there exists today a different reality in PNG from that portrayed in the SOI, illustrate why it is inappropriate to give the SOI final and conclusive weight as establishing a political question under Baker.
 
 
 [14]
 We also recalledBaker's warning against "sweeping statements that imply all questions involving foreign relations are political ones" and its command to courts to undertake a "case-by-case analysis to determine whether the question posed lies beyond judicial cognizance." 410 F.3d at 544-45. We characterized the dissent, which "would have the political question doctrine remove from our courts all matters that fall by their constitutional DNA into th[e] sphere of conduct involving foreign relations," id. at 547 (internal quotations omitted), as setting forth "an over-inclusive approach [that] threatens to sweep all cases touching foreign relations beyond the purview of the courts—a practice warned against in Baker." Id.
 
 
 [15]
 Rio Tinto has not appealed the nondismissal of the war crimes and violations of the laws of war claims under the act of state doctrine, but argues against it only in response to the plaintiffs' appeal as to the act of state dismissals
 
 
 [16]
 The agreement is codified in the Bougainville Copper Agreement Act
 
 
 [17]
 As noted above,see supra note 15, Rio Tinto has waived any appeal of the district court's failure to dismiss the war crimes and violations of the laws of war claims on act of state grounds. We note, however, that the act of state doctrine has been interpreted to apply only to legitimate acts of warfare. See, e.g., Linder v. Portocarrero, 963 F.2d 332, 336 (11th Cir.1992) (holding that "there is no foreign civil war exception to the right to sue for tortious conduct that violates the fundamental norms of the customary laws of war"); see also Flatow v. Islamic Republic of Iran, 999 F.Supp. 1, 24 (D.D.C.1998) (concluding that political assassinations "are not valid acts of state of the type which bar consideration of this case"). Because such conduct violates jus cogens norms, it does not constitute an official act. See, e.g., Siderman de Blake, 965 F.2d at 715-18.
 
 
 [18]
 Our circuit has not explicitly held that district court dismissals or refusals to dismiss on the ground ofinternational comity are reviewed for abuse of discretion, although it has settled that comity decisions in general are reviewed under that standard. See, e.g., Stock West Corp. v. Taylor, 964 F.2d 912, 917-18 (9th Cir.1992) (regarding comity owed to state courts). We join our sister circuits in clarifying that this abuse of discretion review applies to dismissals on grounds of international comity as well.
 
 
 [19]
 Once again, Rio Tinto failed to appeal the district court's comity ruling, confining its arguments against it to its response to plaintiffs' appealSee supra notes 15 & 17.
 
 
 [20]
 We also note that whether the presence of a conflict is a predicate inquiry, or simply one factor in a multipart inquiry, is academic here, as the district court did not abuse its discretion in identifying a conflict
 
 
 [21]
 A "compensation claim" is defined to include any claim "in connection with" a mining project "which relates to or concerns" environmental harm, takings, or, more broadly "extends to any other matter" or "seeks the payment of damages, compensation or any other form of monetary relief."
 
 
 [22]
 As with the act of state claims, Rio Tinto has failed to appeal the district court's ruling, but argues in response to the plaintiffs' arguments that the district court inappropriately failed to dismiss the war crimes and violations of the laws of war claims on comity grounds. Even if Rio Tinto had not waived any appeal, the district court did not abuse its discretion in failing to dismiss these claims on comity grounds
 
 
 [23]
 The ambiguity alluded to arose from Judge Bork's concurring opinion inTel-Oren, 726 F.2d at 799, where he held that the ATCA and its reference to the law of nations did not amount to a congressional grant of a cause of action. In Congress' words, "[t]he TVPA would provide such a grant." H.R.Rep. No. 102-367 at 4, 1992 U.S.C.C.A.N. at 86; see also 28 U.S.C. § 1350, historical and statutory notes, Torture Victim Protection, Section 2 Establishment of civil action. The ambiguity has also been resolved by the Supreme Court's interpretation of the ATCA in Sosa:
 [A]lthough the [ATCA] is a jurisdictional statute creating no new causes of action, the reasonable inference from the historical materials is that the statute was intended to have practical effect the moment it became law. The jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time.
 542 U.S. at 724, 124 S.Ct. 2739.
 
 
 [24]
 Compare 28 U.S.C. § 1350, historical and statutory notes, Torture Victim Protection, Section 2(a) (TVPA) ("An individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture . . . or . . . extrajudicial killing shall, in a civil action, be liable for damages . . . .") with 28 U.S.C. § 1350 (ATCA) ("The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.") (emphasis added).
 
 
 [25]
 Congress also included an exhaustion requirement in another statute involving claims of human rights violations against foreign states, the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602,et seq. Under the FSIA, a court shall decline to hear a case alleging specified human rights abuses against a foreign sovereign unless that sovereign is designated as a state sponsor of terrorism and the plaintiff has afforded the sovereign "a reasonable opportunity" to arbitrate the claim." 28 U.S.C. § 1605(a)(7)(B)(i).
 
 
 [26]
 Despite the dissent's assertion to the contrary (Dissent at 1104), we agree that the TVPA has expanded rather than narrowed U.S. remedies for torture and extrajudicial killing overseas. First, the TVPA created remedies for U.S. citizens never available to them under the ATCA. Second, aliens had only what Congress considered an ambiguous right to bring torture claims under the ATCA because of Judge Bork's opinion inTel-Oren. Thus, the TVPA confirmed the existence of a clear, safe-harbor cause of action for alien victims of torture and extrajudicial killings. The passage of the TVPA can be said to be a narrowing of an alien's remedies for torture in U.S. courts only if, after the TVPA, an alien can no longer bring a torture claim under the ATCA. This was the Seventh Circuit's conclusion in Enahoro. See 408 F.3d at 886 ("It is hard to imagine that the Sosa Court would approve of common law claims based on torture and extrajudicial killing when Congress has specifically provided a cause of action for those violations . . . ."). Rio Tinto has not made this latter argument, and we are not endorsing such a result.
 We do not read torture and extrajudicial killing out of the ATCA, as the dissent claims. (Dissent at 1105.) That issue is not squarely before us, and we note that Enahoro's resolution of the complexities that result from the apparent overlap between the TVPA and the ATCA may not be the only appropriate approach—a clear safe harbor statute need not eclipse the more general and ambiguous statute that preceded it.
 Lastly, the dissent's argument that "[i]f the majority is correct, Congress has made it more difficult for aliens to bring torture claims into U.S. courts because now (under TVPA) they must first exhaust their remedies, whereas previously (under ATCA) they did not" is deeply ironic. (Dissent at 1104 n. 4.) This is actually one of the premises of the dissent's approach—not ours. We hold that exhaustion is not required at this time under the ATCA. It is the dissent that would import exhaustion into the ATCA (which may or may not encompass torture claims after the TVPA) and make it more difficult to bring torture or any other ATCA claim in U.S. courts.
 
 
 [27]
 The dissent's invocation of theCharming Betsy interpretive doctrine in light of the ambiguity in congressional intent is not quite on point. See Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."). (Dissent at 1105-06.) Though reading exhaustion into the ATCA would be consistent with international law norms, failing to read exhaustion into the ATCA would not violate those norms.
 
 
 [28]
 The dissent is incorrect in its assertion that we "infer[] that exhaustion, which was expressly included in TVPA, must necessarily have been left out of ATCA, which has no exhaustion requirement." (Dissent at 1104.) All that we can conclude with any certainty from the TVPA is that it does not answer the question of what Congress intended with respect to an exhaustion requirement in the ATCA
 Furthermore, our reasoning has little connection to that of Papa v. United States, 281 F.3d 1004 (9th Cir.2002), where we read the statute of limitations from the TVPA into the ATCA. (Dissent at 1105.) The question of whether there should be a limitations period was never considered by Papa. Relying on North Star Steel Co. v. Thomas, 515 U.S. 29, 33, 115 S.Ct. 1927, 132 L.Ed.2d 27 (1995) ("[O]ften federal statutes fail to provide any limitations period for the causes of action they create, leaving courts to borrow a period . . . to limit these claims.") (cited by Papa, 281 F.3d at 1012 n. 30), Papa assumed that like any other civil cause of action considered by the Supreme Court, an ATCA suit must have a limitations period. Therefore, Papa was left only with the question of how long that limitations period should be. If the ATCA is to have an imported exhaustion requirement, then the TVPA may be a good source for determining the standards of that requirement. But this does not answer the antecedent question of whether exhaustion should be imported into the ATCA in the first instance. Lastly, we acknowledge that it is hazardous to attempt to gauge congressional intent from silence or comments expressed in the context of another statute's legislative history, but we must make do with the meager legislative history available to us. Moreover, it seems no more hazardous than the dissent's preference for reading a new requirement into a law that does not explicitly provide for it. "If Congress intended to do something different, let Congress fix it." Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Servs., Inc., 448 F.3d 1092, 1100 (9th Cir.2006) (Bybee, J., dissenting from denial of rehearing en banc).
 
 
 [29]
 The dissent's suggestion that "[n]othing inSosa or ATCA indicates that this distinction [between domestic and international tribunals] matters," (Dissent at 1112), misses the point. Sosa did not hold simply that the "ATCA was written in order to bring the law of nations into American courts" (Dissent at 1112), but that only some portions of the law of nations are brought into American courts through the ATCA. See Sosa, 542 U.S. at 720, 725, 124 S.Ct. 2739. If in determining which portions of the law of nations are usable for ATCA purposes, we rely upon sound judicial discretion (as argued at length by the dissent at 1113-22), we should not be lulled into a false sense of familiarity with the term "exhaustion" just because it is the same term that we use to describe an analogous doctrine in our domestic law. Although the concepts of exhaustion may be analogous in the international and domestic spheres, they are not identical, and the international law of exhaustion has developed in part as a result of uniquely international concerns.
 
 
 [30]
 This premise is consistent with the rules of the two ad hoc international criminal tribunals, for the former Yugoslavia and Rwanda, which establish the "primacy" of the respective international criminal tribunal over its national counterpart without regard for the international rule of exhaustionSee International Criminal Tribunal for the former Yugoslavia, Rules of Procedure and Evidence, pt. 2, rules 8-13, U.N. Doc. IT/32/Rev.7 (1996), entered into force Mar. 14, 1994, as amended Jan. 8, 1996, available at http://www1.umn. edu/humanrts/icty/ct-rules7.html; International Criminal Tribunal for Rwanda, Rules of Procedure and Evidence, pt. 2, rules 8-13, U.N. Doc. ITR/3/REV.1 (1995), entered into force June 29, 1995, available at http://www1.umn.edu/humanrts/africa/ RWANDA1.htm.
 
 
 [31]
 Many of the policy arguments in favor of exhaustion—including (i) the dissent's concern with "undermin[ing] local governments" (Dissent at 1115), (ii) "single-handedly derail[ing] diplomacy" (Dissent at 1121), (iii) the inability of courts "to make . . . subtle adjustments in response to national and world events" (Dissent at 1121) and (iv) the premise that "[a] lawsuit in U.S. courts will rarely be the best way to resolve supranational conflicts" (Dissent at 1116)—apply nearly as well to ATCA (and TVPA) cases where local remedieshave been exhausted.
 Further, because of the "futility" exception to the exhaustion rule, see Foreign Relations Law Restatement § 703 cmt. d ("That [exhaustion] requirement is met if it is shown that [no domestic remedies are] available or that it would be futile to pursue them."), many potential human rights cases brought under the ATCA will be excused from satisfying the exhaustion requirement altogether even if we were to read it into the statute— thus side-stepping exhaustion's purported benefits. And for those countries where evidence of the futility of requiring exhaustion is less clear cut, ATCA plaintiffs and defendants will no doubt ask U.S. courts to conduct "sensitive inquiries into the internal affairs of other countries" (Dissent at 1119) to determine the adequacy of those countries' legal and political systems. In sum, the proffered exhaustion rule may not accomplish quite so much as the dissent predicts.
 
 
 [32]
 Sosa, rather than the administrative law cases relied upon by the dissent, dissent at 1103 (citing McCarthy v. Madigan, 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) (quoting Patsy, 457 U.S. at 501, 102 S.Ct. 2557), superseded by statute as stated in Booth v. Churner, 532 U.S. 731, 739, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)), is the appropriate starting point for determining the scope of our discretion with respect to the ATCA. Given the specialized jurisprudence developing around the ATCA, we question whether Patsy and McCarthy's holdings regarding judicial discretion to impose exhaustion of administrative remedies can be uncritically transferred to the international law context.
 
 
 [33]
 Cf. Eberhart v. United States, ___ U.S. ___, ___, 126 S.Ct. 403, 407, 163 L.Ed.2d 14 (2005) (per curiam) ("Although we find its disposition to have been in error, . . . the Seventh Circuit felt bound to apply [precedent], even though it expressed grave doubts. . . . This was a prudent course. It neither forced the issue by upsetting what the Court of Appeals took to be our settled precedents, nor buried the issue by proceeding in a summary fashion. By adhering to its understanding of precedent, yet plainly expressing its doubts, it facilitated our review.")
 
 
 BYBEE, Circuit Judge, dissenting:
 
 131
 In Sosa v. Alvarez-Machain, the Supreme Court addressed arguments that "international law requires that before asserting a claim in a foreign forum, the claimant must have exhausted any remedies available in the domestic legal system." 542 U.S. 692, 733 n. 21, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). Although declining to do so in Sosa, the Court declared that it "would certainly consider this requirement in an appropriate case." Id. This is such a case.[1]
 
 
 132
 Plaintiffs—Bougainvilleans alleged that Rio Tinto, a multinational British corporation, violated various jus cogens, including war crimes, crimes against humanity, racial discrimination, and environmental despoliation. They also allege that Rio Tinto directed these actions through the government of Papua New Guinea ("PNG"). These actions took place beginning in the early 1960s, culminating in a 10-year civil war from 1990 to 2000. See Sarei v. Rio Tinto PLC, 221 F.Supp.2d 1116, 1121-27 (C.D.Cal.2002). In 2001, the U.S. Department of State warned that adjudication of the Bougainville claims in U.S. courts posed a "very grave" threat to the "conduct of our foreign relations." The State Department's Statement of Interest was backed by assurances from the then-PNG government that litigation in U.S. courts had "potentially very serious . . . implications" for PNG and "especially its relations with the United States." On reargument following Sosa, we now have evidence before us, although it is unauthenticated, that the new PNG government regards this suit as "help[ing to] facilitate the process . . . of rectifying . . . historic injustices" and that U.S.-PNG relations will actually be adversely affected "if the litigation is discontinued."
 
 
 133
 This case cries for exhaustion of local remedies before we assume jurisdiction. The majority holds that it "cannot conclude that legislative intent supports [finding] an exhaustion requirement" in the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, and, as a matter of discretion, the majority declines to create one. Maj. op. at 1094-95. The majority then reverses the district court, finding that the case is justiciable without infringing U.S. or PNG prerogatives under the political question, act of state, and comity doctrines. I would draw different inferences from the Act and its complicated history.
 
 
 134
 ATCA provides jurisdiction in federal courts for causes of action created by substantive international law. In my view, international law requires exhaustion of local remedies as a condition to bringing an international cause of action in a foreign tribunal. Even if international law did not so require exhaustion, I would, as an exercise in discretion, require it as a matter of our domestic law. Exhaustion promotes comity between Article III courts and any processes available for resolving disputes within PNG, and it preserves our own role within the separation of powers. I respectfully dissent.
 
 
 135
 * The Supreme Court has "acknowledged the general rule that parties exhaust prescribed administrative remedies before seeking relief from the federal courts." McCarthy v. Madigan, 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992), superceded by statute as stated in Booth v. Churner, 532 U.S. 731, 732, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). "[E]xhaustion was originally a judge-made rule designed not as a technical doctrine but rather to prevent premature and unjustified interference in state proceedings." Justices of Boston Mun. Court v. Lydon, 466 U.S. 294, 333 n. 3, 104 S.Ct. 1805, 80 L.Ed.2d 311 (1984) (Stevens, J., concurring in part and concurring in the judgment); see also Carr v. Pac. Mar. Ass'n, 904 F.2d 1313, 1321 (9th Cir.1990) (applying an exhaustion requirement that "is a judge-made requirement, not one mandated by [the applicable statute] or collective bargaining agreement"). It is thus "grounded in principles of comity." Castille v. Peoples, 489 U.S. 346, 349, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989). Judge-made or prudential exhaustion is not a prerequisite to the exercise of jurisdiction, but rather "one among related doctrines—including abstention, finality, and ripeness—that govern the timing of federal-court decisionmaking." McCarthy, 503 U.S. at 144, 112 S.Ct. 1081. Prudential exhaustion does not go to the power of the court—it does not deprive the court of jurisdiction—but holds that "that power will not ordinarily be exercised until after an appeal made to the State courts has been denied." Davis v. Burke, 179 U.S. 399, 401-02, 21 S.Ct. 210, 45 L.Ed. 249 (1900).[2] In effect, the exhaustion requirement holds that even if the dispute is ripe, it may not be ripe for decision in this forum.
 
 
 136
 Although federal courts created the exhaustion doctrine in the habeas context to prevent "unnecessary conflict between [federal and state] courts equally bound to guard and protect rights secured by the constitution," Ex parte Royall, 117 U.S. 241, 251, 6 S.Ct. 734, 29 L.Ed. 868 (1886), we have required exhaustion in other contexts where it will respect the processes afforded by a separate sovereign. For example, the Supreme Court has required exhaustion of tribal remedies so as not to "impair the authority of tribal courts," and to "reflect[ ] the fact that Indian tribes retain `attributes of sovereignty over both their members and their territory.'" Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 14-15, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987) (quoting United States v. Mazurie, 419 U.S. 544, 557, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975)). In National Farmers Union Insurance Cos. v. Crow Tribe, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), the Court reversed the judgment and remanded the case because "[u]ntil petitioners have exhausted the remedies available to them in the Tribal Court system, it would be premature for a federal court to consider any relief." Id. at 857, 105 S.Ct. 2447 (citation omitted). Referring to National Farmers, the Court later commented that "considerations of comity direct[ed] that tribal remedies be exhausted" even though "the existence of tribal court jurisdiction presented a federal question within the scope of 28 U.S.C. § 1331." Iowa Mut., 480 U.S. at 15, 107 S.Ct. 971.
 
 
 137
 The Court has also required exhaustion of federal administrative remedies as "`an expression of executive and administrative autonomy.'" McKart v. United States, 395 U.S. 185, 194, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969) (quoting LOUIS L. JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 425 (1965)); see also Pavano v. Shalala, 95 F.3d 147, 150 (2d Cir.1996) ("Parties are generally required to exhaust their administrative remedies, in part because of concerns for separation of powers."); Muhammad v. Carlson, 739 F.2d 122, 124 (3d Cir.1984) ("The principles of exhaustion have a constitutional dimension. For courts to act prematurely, prior to the final decision of the appropriate administrative agency, would raise a serious question implicating the doctrine of separation of powers."), superceded by statute as recognized in Nyhuis v. Reno, 204 F.3d 65, 71 n. 7 (3d Cir.2000). The Court has explained its concerns:
 
 
 138
 Certain failures to exhaust may deny the administrative system important opportunities "to make a factual record" . . . or "to exercise its discretion or apply its expertise" in the course of decisionmaking. There may be a danger that relaxation of exhaustion requirements, in certain circumstances, would induce "frequent and deliberate flouting of administrative processes," thereby undermining the scheme of decisionmaking that Congress has created. And of course, a strict exhaustion requirement tends to ensure that the agency have additional opportunities "to discover and correct its own error," and thus may help to obviate all occasion for judicial review.
 
 
 139
 McGee v. United States, 402 U.S. 479, 484, 91 S.Ct. 1565, 29 L.Ed.2d 47 (1971) (citations omitted) (quoting McKart, 395 U.S. at 194-95, 89 S.Ct. 1657); see also Zara v. Ashcroft, 383 F.3d 927, 931 (9th Cir.2004); Ruviwat v. Smith, 701 F.2d 844, 845 (9th Cir.1983) (per curiam).
 
 
 140
 As I discuss in Part IV.A, I believe that the same considerations of respect for state and tribal judicial processes dictate that we stay our hand out of deference to foreign processes that may resolve disputes that could otherwise be brought before us under ATCA. Furthermore, as I discuss in Part IV.B, separation of powers concerns over the judiciary's role in mediating disputes that may implicate the foreign affairs powers of the United States further recommend that parties exhaust their local remedies before coming to the courts of the United States. Before addressing these two points, however, I address in Part II the question of whether Congress has statutorily precluded exhaustion in this case, and in Part III whether, as a matter of international norms, exhaustion of local remedies is required before claims may be brought in a foreign or supranational forum.
 
 II
 
 141
 * "Notwithstanding the[ ] substantial institutional interests [promoted by exhaustion of remedies], federal courts are vested with a `virtually unflagging obligation' to exercise the jurisdiction given them." McCarthy, 503 U.S. at 146, 112 S.Ct. 1081 (quoting Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817-18, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). On the other hand,"[t]he injunction to hear the case summarily, and thereupon to dispose of the party as law and justice require, does not deprive the court of discretion as to the time and mode in which it will exert the powers conferred upon it." Ex parte Royall, 117 U.S. at 251, 6 S.Ct. 734 (internal quotation marks omitted). What is critical for us is whether in ATCA Congress has spoken clearly to the question of exhaustion of remedies—either to compel or forbid exhaustion—because otherwise we may consider the wisdom of the rule for ourselves. "Unlike other statutory questions, exhaustion is `a rule of judicial administration,' and unless Congress directs otherwise, rightfully subject to crafting by judges." Patsy v. Bd. of Regents, 457 U.S. 496, 518, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) (White, J., concurring in part) (quoting Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50, 58 S.Ct. 459, 82 L.Ed. 638 (1938)).
 
 B
 
 142
 Without repeating all that the majority has covered, I begin with the obvious: ATCA does not expressly require exhaustion of remedies before an alien may invoke the jurisdiction of U.S. courts and seek a remedy in "tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.[3] As the majority points out, in what little legislative history we have on ATCA—and the record is scant—there is no mention of exhaustion of local remedies. Moreover, as the Torture Victim Protection Act ("TVPA") evidences, Congress knows how to require exhaustion of remedies for torts "committed in violation of the law of nations or a treaty of the U.S." when it wishes to do so. See Pub.L. No. 102-256, § 2(b), 106 Stat. 73, codified at 28 U.S.C. § 1350 note, § 2(b) ("A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred.").
 
 
 143
 When two statutes address similar matters and one of them expressly requires an act while the other is silent, it is perfectly reasonable to infer that Congress intended that the act be performed in the one case, but not in the other. Bates v. United States, 522 U.S. 23, 30, 118 S.Ct. 285, 139 L.Ed.2d 215 (1997); Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983); Sarei, 221 F.Supp.2d at 1132-39; see also Maj. op. at 1092. This inference does not hold, however, with respect to exhaustion. Ordinarily, for domestic matters, "[o]f `paramount importance' to any exhaustion inquiry is congressional intent," so that "[w]here Congress specifically mandates, exhaustion is required. But when Congress has not clearly required exhaustion, sound judicial discretion governs." McCarthy, 503 U.S. at 144, 112 S.Ct. 1081 (emphasis added) (quoting Patsy, 457 U.S. at 501, 102 S.Ct. 2557). If we may require exhaustion in the absence of a congressional mandate in domestic law, surely we may do so for causes of action that are not created under domestic law, particularly where, as I discuss in Part III, exhaustion is a well-recognized requirement of the "law of nations."
 
 
 144
 If ATCA and TVPA were purely domestic statutes I might find the inference drawn from the differences between the two statutes persuasive. Although it is true, as the district court noted, that ATCA is "a creature of domestic law," 221 F.Supp.2d at 1139, ATCA does not deal exclusively with domestic matters. ATCA both creates jurisdiction in Article III courts—a matter within Congress's domestic powers, see U.S. CONST. art. III, § 1 — and implicitly recognizes that there are causes of action in tort created by the law of nations or by treaties of the United States. See Sosa, 542 U.S. at 731 n. 19, 124 S.Ct. 2739. ATCA, however, does not create such causes of action; instead, it looks to non-domestic sources of law to create such causes of action. Id. at 724, 124 S.Ct. 2739. By contrast, TVPA is not a jurisdiction-creating statute; rather, it creates a domestic cause of action against any "individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture." Pub.L. No. 102-256, § 2(a)(1), 106 Stat. 73, codified at 28 U.S.C. § 1350 note, § 2(a)(1); see also Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 104-05 (2d Cir.2000). Prior to TVPA's enactment in 1992, such an action, being a violation of jus cogens, see Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 714-15 (9th Cir.1992), could have been brought in federal court under the jurisdiction of ATCA. TVPA establishes torture as "an unambiguous and modern basis for a cause of action," thus eliminating any question of an available remedy in U.S. courts. H.R. REP. No. 102-367, pt. 2, at 3 (1991), reprinted in 1992 U.S.C.C.A.N. 84, 86. If the majority is correct, however, then TVPA has actually narrowed the U.S. remedy for torture by requiring exhaustion in TVPA where it was not previously required for causes of action brought under ATCA. It is thus more difficult to bring a torture claim in federal courts— because of the exhaustion requirement— than it is other international causes of action.[4] See Maj. op. at 1093-94 n. 26; see also Enahoro v. Abubakar, 408 F.3d 877, 884-86 (7th Cir.2005); id. at 889-90 (Cudahy, J., dissenting).
 
 
 145
 It makes little sense to think that Congress, having codified a cause of action for torture would, at the same time, restrict its availability. If Congress intended to subject a cause of action for torture to procedural demands not required for violation of other jus cogens, we might have expected Congress to comment on the new requirement. Instead, Congress simply commented on the utility of the exhaustion requirement to "ensure[] that other U.S. courts will not intrude into cases more appropriately handled by courts where the alleged torture or killing occurred. It will also avoid exposing U.S. courts to unnecessary burdens, and can be expected to encourage the development of meaningful remedies in other countries." H.R. REP. No. 102-367, pt. 1, at 5 (1991), reprinted in 1992 U.S.C.C.A.N. 84, 87-88.
 
 
 146
 Furthermore, the majority's comparison of ATCA and TVPA ignores their unique history. Congress enacted TVPA in response to uncertainty over ATCA following Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir.1980), and the Edwards-Bork debate in Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C.Cir.1984). TVPA clarifies ATCA, providing an "unambiguous" cause of action for torture and extrajudicial killing. Because Congress left ATCA "intact," presumably it continues to mean what it meant prior to 1992. Where the majority and I part is over how to read ATCA in light of the subsequent enactment of TVPA: I would read little into ATCA from the enactment of TVPA more than 200 years later; the majority infers that exhaustion, which was expressly included in TVPA, must necessarily have been left out of ATCA, which has no exhaustion requirement. As I previously suggested, the inference the majority draws from this comparison might be reasonable in some contexts; I do not believe it is useful here. Indeed, applying the majority's principle might lead us to conclude that ATCA has no statute of limitations—since the ATCA is silent, but TVPA contains an express limitation. Compare 28 U.S.C. § 1350 (containing no express statute of limitations) with 28 U.S.C. § 1350 note, § 2(c) (providing for a ten-year statute of limitations). We have already rejected this conclusion. In fact, we employed the opposite inference, reading TVPA's express statute of limitations back into ATCA. See Deutsch v. Turner Corp., 324 F.3d 692, 717 n. 18 (9th Cir.2003); Papa v. United States, 281 F.3d 1004, 1011-12 (9th Cir.2002) ("We are squarely faced with the issue here, and we decide that the statute of limitations applicable to the ATCA is that provided by the TVPA."). Furthermore, the majority's reasoning suggests that torture and extrajudicial killing, having been expressly included in TVPA, must be read out of ATCA, meaning that causes of action for these offences are no longer part of the law of nations. See Enahoro, 408 F.3d at 884-85, 886 (holding that torture claims are no longer available under ATCA—not because torture is excluded from the law of nations—but because TVPA now "occup[ies] the field").[5]
 
 
 147
 It makes more sense to think that Congress codified the exhaustion requirement because it believed it was consistent with international law and, thus, consistent with other causes of action that would come within ATCA's jurisdiction. The Senate Judiciary Committee cited international practice as proof that TVPA's exhaustion requirement was appropriate. "[T]he procedural practice of international human rights tribunals generally holds that the respondent has the burden of raising the nonexhaustion of remedies as an affirmative defense and must show that domestic remedies exist that the claimant did not use." S. REP. No. 102-249, pt. 4, at 10 (1991). The committee explained that "as this legislation involves international matters and judgments regarding the adequacy of procedures in foreign courts, the interpretation of [the exhaustion provision], like the other provisions of this act, should be informed by general principles of international law." Id.
 
 
 148
 While TVPA evidences Congress's recognition of exhaustion in international law, we should not draw a contrary inference from the absence of an express exhaustion requirement in ATCA. As I have mentioned, TVPA is not a jurisdiction-creating statute. Rather, it creates a cause of action for which there is jurisdiction in the U.S. courts under ATCA. See Hilao v. Estate of Marcos, 103 F.3d 767, 778 (9th Cir.1996). ATCA, by contrast, is a jurisdiction-creating statute. See Sosa, 542 U.S. at 729, 124 S.Ct. 2739. In and of itself, ATCA does not require exhaustion as a condition precedent to the exercise of jurisdiction by Article III courts. At the same time, ATCA acknowledges the existence of causes of action recognized by international law or created by U.S. treaties. As the Court explained in Sosa, "the First Congress understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations" and such "norm[s] of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized." Id. at 724-25, 124 S.Ct. 2739; see also id. at 730-31, 124 S.Ct. 2739. The elements of those substantive causes of action are defined by international law, not by our domestic law, and may be subject to an exhaustion requirement if international law would recognize exhaustion of remedies as an international law norm. To the extent we think there is ambiguity between the explicit requirement of TVPA and the implicit mandate of ATCA, we should resolve the ambiguity in favor of a reading that accords with international law. See Murray v. Charming Betsy, 6 U.S. (2 Cranch) 64, 2 L.Ed. 208 (1804) ("[A]n act of congress ought never to be construed to violate the law of nations if any other possible construction remains.").
 
 
 149
 This approach comports with our previous efforts to harmonize ATCA with the more explicit requirements of TVPA. As Judge Cudahy has explained, "an implicit exhaustion requirement in the ATCA would have something to recommend it. Doing so would, among other things, bring the Act into harmony with both the provisions of the TVPA (with which it is at least partially coextensive) and with the acknowledged tenets of international law." Enahoro, 408 F.3d at 889-90 (Cudahy, J., dissenting).[6] It would also comport with Sosa's mandate that we exercise "great caution" in expanding the range of claims that can be heard under ATCA.[7] 542 U.S. at 728, 124 S.Ct. 2739. It is to the question whether international law requires exhaustion of local remedies that I now turn.
 
 III
 
 150
 At the time of its enactment, ATCA granted federal courts jurisdiction "to hear claims in a very limited category defined by the law of nations and recognized at common law." Sosa, 542 U.S. at 712, 124 S.Ct. 2739. Although "a consensus understanding of what Congress intended has proven elusive," the Sosa Court determined that "no development in the two centuries from the enactment of § 1350 to the birth of the modern line of cases . . . has categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law." Id. at 719, 724-25, 124 S.Ct. 2739. Claims that may be brought within ATCA are not limited to those permitted under the law of nations as it existed at the time of the statute's enactment in 1789; but include those "based on the present-day law of nations" as long as they "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized." Id. at 725, 124 S.Ct. 2739. There is strong evidence that international law—as evidenced in a variety of sources—recognizes exhaustion of remedies as a condition precedent to seeking relief before foreign and international tribunals.
 
 
 151
 Exhaustion is a well-established principle of international law, recognized by courts and scholars both here and abroad. It is so well entrenched that one scholar has written that "the celebrated `rule of local remedies' is accepted as a customary rule of international law [and] needs no proof today, as its basic existence and validity has not been questioned," and that the rule's "wide and unchallenged acceptance is evidence of its utility and of the soundness of its policy foundation." CHITTHARANJAN FELIX AMERASINGHE, LOCAL REMEDIES IN INTERNATIONAL LAW 3 (2d ed.2003); David R. Mummery, The Content of the Duty to Exhaust Local Judicial Remedies 58 AM. J. INT'L L. 389, 390 (1964); see also IANBROWNLIE, PRINCIPLES OF PUBLIC INTERNATIONAL LAW 472-73 (6th ed. 2003) ("A claim will not be admissible on the international plane unless the individual alien or corporation concerned has exhausted the legal remedies available to him in the state which is alleged to be the author of the injury. This is a rule which is justified by practical and political considerations . . . .").
 
 
 152
 * The United States has long recognized exhaustion of local remedies as a principle of international law. The Jay Treaty, drafted just five years after ATCA, included an exhaustion provision. Creditors could only turn to the arbitration tribunal established by the treaty if they could not obtain recourse through "the ordinary course of judicial proceedings." See Treaty of Amity, Commerce, and Navigation (Jay Treaty), U.S.-U.K., art. VI, Nov. 19, 1794, 8 Stat. 116.[8] According to the Restatement (Third) of the Foreign Relations Law of the United States, remedies for human rights violations may be pursued "only after the individual claiming to be a victim of a human rights violation has exhausted available remedies under the domestic law of the accused state," or has shown that such efforts would be futile. § 703 comment d (1987). The executive branch recognized the power of the principle when it required U.S. nationals to exhaust their available remedies in Castro's Cuba, explaining that "[t]he requirement for exhaustion of legal remedies is based upon the generally accepted rule of international law that international responsibility may not be invoked . . . until after exhaustion of the remedies available under local law." United States State Department Memoranda of March 1, 1961, quoted in Ernest L. Kerley, Contemporary Practice of the United States Relating to International Law, 56 AM. J. INT'L L. 165, 167 (1962); see also Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 422-23, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) ("Because of [international law's] peculiar nation-to-nation character the usual method for an individual to seek relief is to exhaust local remedies and then repair to the executive authorities of his own state to persuade them to champion his claim in diplomacy or before an international tribunal.").
 
 B
 
 153
 International tribunals have also recognized and applied exhaustion, regardless of whether the principle has been called for in a formal agreement.[9] The International Court of Justice has repeatedly declined to hear cases on this ground, explaining that "the rule that local remedies must be exhausted before international proceedings may be instituted is a well-established rule of customary international law." Interhandel (Switzerland v. United States of America), 1959 I.C.J. 6, 27 (March 21), see also Case Concerning Avena and Other Mexican Nationals (Mexico v. United States), 2004 I.C.J. 12, 128 (March 31) (allowing Mexico's claims to proceed, but barring individual claims because "[t]he individual rights of Mexican nationals . . . are rights which are to be asserted, at any rate in the first place, within the domestic legal system of the United States.") (quotations omitted); Case of Certain Norwegian Loans (France v. Norway), 1957 I.C.J. at 39 (Lauterpacht, J., concurring and dissenting) (explaining that "however contingent and theoretical these remedies may be, an attempt ought to have been made to exhaust them"). The ICJ has recognized that the exhaustion requirement is so fundamental that, even where an international agreement fails to include the provision, it exists by default unless the agreement expressly states that exhaustion is not required. International jurisprudence is "unable to accept that an important principle of customary international law should be held to have been tacitly dispensed with, in the absence of any words making clear an intention to do so." Case Concerning Elettronica Sicula S.p.A. (United States v. Italy), 1989 I.C.J. 15, 42, 76 (July 20); see also Case Concerning Avena, 2004 I.C.J. at 48 n. 97 (Counter-Memorial of the United States of America) ("The Court has found the exhaustion requirement so important a principle of customary international law that it held that the requirement of exhaustion may not be assumed to have been dispensed with under a treaty unless that treaty expressly so provides."); A.O. Adede, A Survey of Treaty Provisions on the Rule of Exhaustion of Local Remedies, 18 HARV. INT'L L.J. 1, 8 n. 19 (1977) (noting that where exhaustion is not explicitly provided, it may not be treated as excluded, as "no such implication from the mere fact of silence is proper").
 
 
 154
 The American Convention on Human Rights, European Convention for the Protection of Human Rights and Fundamental Freedoms, International Convention on the Elimination of All Forms of Racial Discrimination, and the African Commission on Human and Peoples' Rights all require exhaustion. See Organization of American States, American Convention on Human Rights art. 46(1)(a), Nov. 22, 1969, O.A.S.T.S. No. 36, 1144 U.N.T.S. 123, 155, 9 I.L.M. 673, 687 (A requirement of admission of a petition or communication is "that the remedies under domestic law have been pursued and exhausted in accordance with generally recognized principles of international law"); Council of Europe, European Convention for the Protection of Human Rights and Fundamental Freedoms art. 35(1), Nov. 4, 1950, 321 U.N.T.S. 221, E.T.S. 5, as amended by Protocol No. 3, E.T.S. 45, Protocol No. 5, E.T.S. 55 and Protocol No. 8, E.T.S. 118 ("The Court may only deal with the matter after all domestic remedies have been exhausted, according to the generally recognised rules of international law. . . ."); International Convention on the Elimination of All Forms of Racial Discrimination, art. 11, para. 3, March 7, 1960, 660 U.N.T.S. 211, 226 ("The Committee shall deal with a matter referred to it in accordance with paragraph 2 of this article after it has ascertained that all available domestic remedies have been invoked and exhausted in the case, in conformity with the generally recognized principles of international law. This shall not be the rule where the application of the remedies is unreasonably prolonged."); African Charter on Human and Peoples' Rights, art. 50, June 27, 1981, 1520 U.N.T.S. 217, 255, 21 I.L.M. 58 ("The Commission can only deal with a matter submitted to it after making sure that all local remedies, if they exist, have been exhausted, unless it is obvious to the Commission that the procedure of achieving these remedies would be unduly prolonged."). Exhaustion is so well established that the failure to include an exhaustion requirement may call the viability of the agreement into question.
 
 
 155
 The local remedies rule [adopted in the UN Covenant of Civil and Political Rights] assumed a central role in the debates on the right of individual petition. In fact, one may legitimately wonder whether that right would have been granted at all (even in an optional protocol) had the rule not been provided for.
 
 
 156
 A.A. Cançado Trindade, Exhaustion of Local Remedies Under the UN Covenant on Civil and Political Rights and its Optional Protocol, 28 INT'L & COMP. L.Q. 734, 755 (1979).
 
 
 157
 It is far from clear that, as the majority claims, "exhaustion is procedural rather than substantive." Maj. op. at 1097. In a recent meeting of the UN-sponsored International Law Commission, delegates were still engaged in "the long-standing game of debating whether the rule of exhaustion of local remedies is substantive or procedural," "an issue on which much intellectual energy has been wasted." Robert Rosenstock & Margo Kaplan, Current Development: The Fifty-Third Session of the International Law Commission, 96 A M.J. INT'L L. 412, 417 (2002). One scholar has noted that "[a]s long as the local remedies rule exists, controversy will remain as to the question of its conceptual nature, i.e. the question whether the rule forms a part of procedural law or whether it operates as a part of substantive law." Karl Doehring, Exhaustion of Local Remedies, in 3 ENCYCLOPEDIA OF PUBLIC INTERNATIONAL LAW 238, 240 (Rudolf L. Bindschelder et al, eds., 1997). Codifications of the rule have largely avoided the question. See United Nations Int'l Law Comm'n, Second Report on Diplomatic Protection, ¶ 35, UN Doc. A/CN.4/514/ (February 28, 2001) (prepared by John Dugard); see also Bradford K. Gathright, Comment, Step in the Wrong Direction: The Loewen Finality Requirement and the Local Remedies Rule in NAFTA Chapter Eleven, 54 EMORY L.J. 1093, 1124 (2005) (noting that disagreement about the rule's status prompted delegates to the 1930 Hague Codification Conference to "le[ave] the answer intentionally ambiguous").
 
 
 158
 There appear to be three schools of thought. The first contends that the rule "applies necessarily, and primarily, to the determination of the existence of an internationally wrongful act arising through the breach of an international obligation, and thus to the genesis of international responsibility." United Nations Int'l Law Comm'n, Sixth Report on State Responsability, ¶ 52, UN Doc. UN Doc. A/CN.4/302 (April 15, June 7, and July 14 1977) (prepared by Roberto Ago). Thus, "there is no international injury . . . until the alien has exhausted his local remedies if available." Edwin M. Borchard, Theoretical Aspects of the International Responsibility of States, 1 ZEITSCHRIFT FUR AUSLANDISCHES OFFENTLICHES RECHT UND VOLKRERRECT 235, 237 (1929) (emphasis in original); see also Mexican Union Railway (UK v. Mexico), 5 R.I.A.A. 115, 122 (1926) ("It is one of the recognized rules of international law that the responsibility of the State under international law can only commence when the persons concerned have availed themselves of all remedies open to them under the national laws of the State in question."); Second Report on Diplomatic Protection, supra, at ¶ 55 (noting one scholar's position that "the exhaustion of remedies rule is a `presupposition' for unlawfulness") (quoting Giorgio Gaja, L'ESAURIMENTO DEI RICORSI INTERNI NEL DIRRITTO INTERNATIONALE (1967)); D.P. O'CONNELL, 2 INTERNATIONAL LAW 1053 (2d ed.1970) (noting that the rule is sometimes explained "on the theory that until municipal remedies have been exhausted there has been no breach of international law in relation to the treatment of individuals" and "the injury is not complete until the avenue [of local remedies] has been explored in vain"). In a widely cited decision, the Admiralty Transport Arbitration Board recognized that "the international breach does not come into existence until the private claim is rejected by the highest competent municipal court," and, accordingly, "the recourse to that court is a matter of substance and not of procedure." Claim of Finnish Shipowners (Finland v. Great Britain), 3 R.I.A.A. 1479 (1934). Under this view, exhaustion of remedies is not
 
 
 159
 a condition of international jurisdiction, but rather a rule of substantive law. While the State of which the claimant is a national may at any time protest concerning the treatment being accorded to its nationals, while it may institute a proceeding, if a competent tribunal exists, for the purpose of establishing that certain treatment is required by international law, it will lack a basis for presenting and prosecuting the particular claim of its national so long as adequate remedies are available to him under the law of the respondent State.
 
 
 160
 J.E.S. Fawcett, The Exhaustion of Local Remedies: Substance or Procedure?, 31 BRIT. Y.B. INT'L L. 452, 452-53 (1954) (quoting MANLEY O. HUDSON, INTERNATIONAL TRIBUNALS: PAST AND FUTURE 189 (1944)). As Judge Hudson of the International Court of Justice expressed it, the local remedies rule "is not a rule of procedure. It is not merely a matter of orderly conduct. It is part of the substantive law as to international, i.e., State-to-State responsibility." Panevezys-Saldutiskis Railway (Estonia v. Lithuania), 1939 P.C.I.J. (ser.A/B) No. 76, at 47 (Hudson, J., dissenting).
 
 
 161
 The second school of thought holds that failure to exhaust remedies is simply a procedural bar to an international law claim. See Maj. op. at 1097 and sources cited therein. According to this approach, international responsibility begins with the wrongful act; "the initial action of a State organ already represents the unlawfulness." DOEHRING, supra at 240.
 
 
 162
 A third camp maintains that the question turns on the facts of each case. "The problem with defining the local remedies rule generally as either procedural or substantive is that because the rule applies broadly to many forms of state responsibility, it serves more than one function." Gathright, supra, at 1125. "Legal opinion is unanimous on this last point: the rule implies a suspensive condition, which may be procedural or substantive, but to which the right to bring international claims is subordinated." Int'l Law Comm'n, First Report on Diplomatic Protection, ¶ 173, UN Doc. A/ CN.4/96 (January 20, 1956) (prepared by F.V. Garcia Amador); See also Fawcett, supra; BROWNLIE, supra, at 497. The United States State Department has weighed in with the third camp, explaining the division this way:
 
 
 163
 Under existing international law where the initial act or wrong of which complaint is made is not imputable to the State, the exhaustion of local remedies is required with a resultant denial of justice on the part of the State in order to impute any responsibility to the State. In this view, the exhaustion of remedies rule is a substantive rule, i.e., it is required from a substantive standpoint under international law in order to impute responsibility to a State.
 
 
 164
 On the other hand, where the initial act or wrong of which complaint it made is imputable to the State, substantively it is unnecessary to exhaust local remedies in order to impute responsibility to the State. . . . [T]he rule of exhaustion of local remedies in such circumstance is procedural . . . ."
 
 
 165
 Accordingly, the rule of exhaustion of local remedies may be substantive in certain types of cases and procedural in others.
 
 
 166
 Memorandum from Marjorie M. Whiteman, Assistant Legal Adviser, Department of State, to International Law Commission (December 18, 1956), Dec. 18, 1956, quoted in M.M. WHITEMAN, 8 DIGEST OF INTERNATIONAL LAW 789-90 (1967).[10]
 
 
 167
 Whether procedural or substantive, exhaustion is a well-established part of the law of nations and ignoring it contravenes those norms. If it is purely substantive, then it is unambiguously required by ATCA. If it is purely procedural, however, it is less clear that it is included in the Supreme Court's mandate that we "recognize private causes of action for certain torts in violation of the law of nations." Sosa, 542 U.S. at 724, 124 S.Ct. 2739.[11] There is no resolution to this debate. We cannot say with certainty whether exhaustion is a substantive or a procedural requirement. But we can say that it certainly qualifies as "a norm of international character" and is "defined with specificity" comparable to the classical causes of action. Sosa, 542 U.S. at 725, 124 S.Ct. 2739. Exhaustion is widely-accepted and well-defined, and it is an integral part of almost every claim in international law.
 
 
 168
 As the majority correctly points out, the local remedies rule was not developed for the use of domestic courts like those who administer ATCA—it grew out of diplomatic protection in state-to-state disputes and now serves international tribunals. Nothing in Sosa or ACTA indicates that this distinction matters. No part of the "law of nations" was developed to serve ATCA; ATCA was written in order to bring the law of nations into American courts. The statute presupposes some difficulty in accommodating the ever-changing law of nations in a domestic context. We cannot reject aspects of the law of nations simply because they are not native to domestic courts.
 
 
 169
 In sum, such a fundamental tenet of international law deserves recognition in U.S. courts bound to apply the law of nations under ATCA. As the Court observed over a hundred years ago:
 
 
 170
 International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination. For this purpose, where there is no treaty and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators who by years of labor, research and experience have made themselves peculiarly well acquainted with the subjects of which they treat.
 
 
 171
 The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900); see also RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES, pt. I, ch. 1 (introductory note) ("International law is law like other law, promoting order, guiding, restraining, regulating behavior. . . . It is part of the law of the United States, respected by Presidents and Congresses, and by the States, and given effect by the courts."). As Judge Cudahy has observed,
 
 
 172
 Certainly in applying a statute like the ATCA, where liability is predicated on `violation of the law of nations,' it would seem natural to honor the basic tenets of public international law. It is also well-established that, as a general proposition, U.S. law should incorporate and comport with international law where appropriate.
 
 
 173
 Enahoro, 408 F.3d at 890 n. 6 (Cudahy, J., dissenting).
 
 C
 
 174
 The exhaustion requirement is not only well accepted in international law, but it is well defined. The Commission of Arbitration has recognized it as the defendant's "right to resist such an action if the persons alleged to have been injured have not first exhausted all the remedies available to them under the municipal law [and] the right to demand that full advantage shall have been taken of all local remedies." Ambatielos Claim (Greece v. United Kingdom), 12 R.I.A.A. 83, 118-19, 23 I.L.R. 306, 334 (1956). Likewise, exceptions to the exhaustion requirement, similar to those in our domestic law, are well-defined and specific. The Restatement explains that exhaustion is waived where remedies are unavailable or where "it would be futile" to pursue them. RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 703 comment d (1987). The rule is flexible; it "is not a purely technical or right rule. It is a rule which international tribunals have applied with a considerable degree of elasticity. In particular, they have refused to act upon it in cases in which there are, in fact, no effective remedies owing to the law of the State concerned or the conditions prevailing in it." Case of Certain Norwegian Loans (France v. Norway), 1957 I.C.J. 9, 39 (July 6) (Lauterpacht, J., concurring and dissenting). The International Covenant on Civil and Political Rights provides that exhaustion is not required when remedies come only after "undue delay," and the same exception has been recognized by the American Convention on Human Rights, which excuses exhaustion in cases of "unwarranted delay in rendering final judgment." United Nations International Covenant on Civil and Political Rights art. 14, Dec. 16, 1966, 999 U.N.T.S. 171; see also Organization of American States, American Convention of Human Rights, Nov. 4, 1950, art. 46(2), O.A.S.T.S. No. 36, 1144 U.N.T.S. 123; Paula Rivka Schochet, Note, A New Role for an Old Rule: Local Remedies and Expanding Human Rights Jurisdiction Under the Torture Victim Protection Act, 19 COLUM. HUM. RTS. L. REV. 23 (1987) (discussing exhaustion provisions in various multinational agreements).
 
 
 175
 U.S. law recognizes similar exceptions to exhaustion. TVPA requires that "[a] court shall decline to hear a claim . . . if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." 28 U.S.C. § 1350 note, § (2)(b) (emphasis added). Legislative history for TVPA suggests that it was understood that TVPA's exhaustion requirement would be excused where it would be excused in an international tribunal, including "when foreign remedies are unobtainable, ineffective, inadequate, or obviously futile." S. REP. No. 102-249, pt. 4, at 10 (1991). According to the Judiciary Committee, exhaustion is not difficult to show. "[I]n most instances the initiation of litigation under this legislation will be virtually prima facie evidence that the claimant has exhausted his or her remedies in the jurisdiction in which the torture occurred. The committee believes that courts should approach cases brought under the proposed legislation with this assumption." Id. at 9-10. The Judiciary Committee anticipated that the courts "will have to undertake a case-by-case approach" to determine when exhaustion is excused, and suggested courts consider "unfairness of the judicial system, unfair procedures, and lack of competence." Id. Although the inquiry is complex, legislators were confident that the principle could be applied by courts as it was "generally consistent with common-law principles of exhaustion as applied by courts in the United States." Id.[12]
 
 IV
 
 176
 Even if exhaustion were not well developed in international law, we should recognize exhaustion as a prudential principle required by our domestic law, and we should recognize it for the same reasons that we require exhaustion of state, tribal and administrative remedies. It has been said that "in this area [of local remedies] particularly international law is essentially a law regulating or attempting to regulate the practice and relationships inter se of national administrations, their officials, agents and proteges, a highly specialized kind of administrative law." Mummery, supra, at 393. Accordingly, the rule "has definite kinship with rules of exhaustion of remedies and primacy of jurisdiction in other areas of the law of administrative organization, namely, domestic administrative law." Id. It is appropriate that we require exhaustion here, where our proceedings would result in a premature and unjustified interference in the resolution of a foreign conflict. Moreover, it will promote our own position within a government of separated powers.
 
 
 177
 * As I discussed in Part I, there are three general reasons offered to justify prudential exhaustion. First, requiring exhaustion demonstrates respect for the courts of a separate sovereign or the administrative agencies of a coordinate branch of government. Second, exhaustion permits such courts or agencies to apply their own expertise to the matters in question, and allows the sovereign or branch to correct any errors in its own procedures before the federal courts assume jurisdiction. Third, even if the matter ultimately finds its way into our courts, exhaustion frequently requires the parties to refine their issues and develop the record in a way that will aid decision in U.S. courts.
 
 
 178
 First, requiring exhaustion of local remedies will promote respect for foreign tribunals or other processes for dispute resolution, such as commissions or political accords.[13] "`Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." Hilton v. Guyot, 159 U.S. 113, 163-64, 16 S.Ct. 139, 40 L.Ed. 95 (1895). Exhaustion of local remedies is not the same as comity in this sense: Exhaustion does not require recognition of the acts of another nation because there are no such acts to recognize. Thus, exhaustion comes before comity, while sharing its purposes. Exhaustion recognizes the possibility of legislative, executive or judicial acts in another nation; it thus respects the processes by which another nation has constituted itself and is worthy to be considered part of the community of nations.
 
 
 179
 Litigation of foreign claims in American courts may undermine local governments, who may be seen as weak or unresponsive when they were given no opportunity to address the problem in the first instance.[14] Taking up cases that can be handled domestically aggravates diplomatic and local tensions because it interferes with local control and stirs up unnecessary publicity. See Steven W. Yale-Loehr, Note, The Exhaustion of Local Remedies Rule and Forum Non Conveniens in International Litigation in U.S. Courts, 13 CORNELL INT'L L.J. 351, 358 (1980). By use of domestic remedies "the intervention of outsiders is avoided (it is noteworthy that any intervention, no matter how skillful and tactful, is invariably disliked as such); and it is possible to avoid the publication of the dispute to the world at large, which often causes exacerbation." Mummery, supra, at 391. The local remedies rule "functions similarly to the principles of comity, avoiding friction between states by permitting peaceful settlement before conflicts erupt." Nsongurua J. Udombana, So Far, So Fair: The Local Remedies Rule in the Jurisprudence of the African Commission on Human and Peoples' Rights, 97 A.M.J. INT'L L. 1, 1 (2003). The rule that "a State should be given the opportunity to redress an alleged wrong within the framework of its own domestic legal system before its international responsibility can be called into question," A.A. CANCADO TRINDADE, THE APPLICATION OF THE RULE OF EXHAUSTION OF LOCAL REMEDIES IN INTERNATIONAL LAW 1 (1983), helps to guard the sovereign against "excessive infringement by state to state claims on behalf of private individuals," see Udombana, supra, at 2 (quoting Jost Delbruck, The Exhaustion of Local Remedies Rule and the International Protection of Human Rights: A Plea for a Contextual Approach, in DES MENSCHEN RECHTZ ZWISCHEN FREIHEIT UND VERANTWORTUNG 213, 217 (Jurgen Jekewitz et al. eds., 1989)). Exhaustion of remedies helps to maintain sovereignty within the international system because
 
 
 180
 the local remedies rule is really a conflict rule. It is, when properly constructed, a rule for resolving conflicts of jurisdiction between international law and municipal tribunals and authorities; the rule determines when and in what circumstances the local courts, on the one hand, and international tribunals, on the other, must or may assume jurisdiction over the issue.
 
 
 181
 Fawcett, supra, at 454.
 
 
 182
 An exhaustion rule "is conducive to good order in that it demarcates the line between the jurisdiction of the national and the international tribunal." Mummery, supra, at 390. A lawsuit in U.S. courts will rarely be the best way to resolve supranational conflicts. As Judge Bork explained in Tel-Oren, "Diplomacy demands great flexibility and focuses primarily on the future rather than on the past, often requiring states to refrain, for the sake of their future relations, from pronouncing judgment on past conduct." 726 F.2d at 818 (Bork, J., concurring); see also id. ("International law, unlike municipal law (at least in the United States), is not widely regarded as a tool of first or frequent resort and as the last word in the legitimate resolution of conflicts.").
 
 
 183
 By accepting jurisdiction over foreign suits that can be appropriately handled locally, the federal courts embroil the nation in a kind of judicial "imperialism" that suggests the United States does not respect or recognize a foreign government's ability to administer justice. See Elliot J. Schrage, Judging Corporate Accountability in the Global Economy, 42 COLUM. J. TRANSNAT'L L. 153, 176 (2003). As one commentator has observed,
 
 
 184
 the local remedies rule reconciles national autonomy with international co-operation in the sense that each state accepts, in broad lines, the judicial remedies provided by other states, and yet this acceptance does not deny the importance of proper international settlement of a dispute and the international standard of justice.
 
 
 185
 Yale-Loehr, supra, at 358 (citing CASTOR H.P. LAW, THE LOCAL REMEDIES RULE IN INTERNATIONAL LAW 19 (1961)).
 
 
 186
 Second, exhaustion of remedies gives other countries the opportunity to address their own conflicts and craft their own solutions. In the domestic context, the doctrine "acknowledges the commonsense notion of dispute resolution that an agency ought to have an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." McCarthy, 503 U.S. at 145, 112 S.Ct. 1081; see also Zara, 383 F.3d at 931 ("The policy underlying the exhaustion requirement is to give an administrative agency the opportunity to resolve a controversy or correct its own errors before judicial intervention."). The principle in international practice is "not to submit [the claimant] to a mere judicial exercise," but is "intended to afford the territorial government an opportunity actually to repair the injury sustained." Mummery, supra, at 402. The exhaustion rule is part of a concerted international effort to encourage countries to provide effective local remedies. See Trindade, supra, 28 INT'L & COMP. L.Q. at 755.
 
 
 187
 This consideration provides perhaps the most important practical consideration for the adoption of an exhaustion requirement in ATCA. If litigants are allowed to seek refuge in U.S. courts before pursuing available remedies at home, we will have facilitated parties—including politically-minded parties—who wish to circumvent the creation and refinement of local remedies.
 
 
 188
 The purpose of the requirement that a decision of a lower court be challenged through the judicial process before the State is responsible for a breach of international law constituted by judicial decision is to afford the State the opportunity of redressing through its legal system the inchoate breach of international law occasioned by the lower court decision.
 
 
 189
 Loewen Group, Inc. (Can.) v. United States, ICSID (W.Bank) ARB(AF)/98/3 (June 26, 2003), quoted in Andrea K. Bjorklund, Reconciling State Sovereignty and Investor Protection in Denial of Justice Claims, 45 VA. J. INT'L L. 809, 856 (2005); see also Interhandel, 1959 I.C.J. at 27; Certain Norwegian Loans, 1957 I.C.J. at 96. The exhaustion provision "can only be beneficial to the development of international law" and will "help[ ] to raise standards in the domestic administration of justice." Trindade, supra, 28 INT'L & COMP. L.Q. at 756. As Congress recognized in debating the exhaustion requirements of TVPA, "[t]his requirement ensures that U.S. courts will not intrude into cases more appropriately handled by courts where the alleged [wrongs] occurred. It . . . can be expected to encourage the development of meaningful remedies in other countries." H.R. REP. No. 102-367, pt. 3, at 5, reprinted in 1992 U.S.C.C.A.N. 84, 88-89.[15]
 
 
 190
 Moreover, litigation is not always the best vehicle for resolving difficult internal matters. Exhaustion may thus encourage creative political solutions beyond our ken. The exhaustion requirement "acknowledges that a sovereign is not only in the best position to succeed, particularly when acting within its own territory, but that a sovereign is also most familiar with the situation and best able to fashion a remedy appropriate to local circumstances." Richard D. Glick, Environmental Justice in the United States: Implications of the International Covenant on Civil and Political Rights, 19 HARV. ENVT'L.L. REV. 69, 99 (1995); see also BROWNLIE, supra, at 473 (noting that "the greater suitability and convenience of national courts as forums for the claims of individuals and corporations" is one of the "more persuasive practical considerations" for the rule).[16] Human rights violations, for example, might more appropriately be addressed with criminal sanctions, rather than civil remedies of TVPA. "[C]riminal prosecutions locate control over such actions in the hands of governments, rather than private citizens, thus avoiding diplomatic turmoil." Beth Stephens, Translating Filartiga: A Comparative and International Law Analysis of Domestic Remedies For International Human Rights Violations, 27 YALE J. INT'L L. 1, 52 (2002). A criminal prosecution at home would help to publicize the violations locally and would help to develop and define applicable criminal laws. Id. One could argue that "civil actions trivialize human rights abuses, implying that the harms inflicted can be compensated through a simple monetary payment." Id.[17]
 
 
 191
 Finally, in domestic administrative law, we require exhaustion because it promotes more accurate adjudication performed by experts "in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion." Far E. Conference v. United States, 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952). Administrative exhaustion aids accuracy because it allows for the development of a more complete record. See Ruviwat, 701 F.2d at 845 ("[T]he requirement of exhaustion of remedies will aid judicial review by allowing the appropriate development of a factual record in an expert forum . . . ."). Similarly, in cases arising under ATCA, local expertise and proximity to witnesses and physical evidence may foster more accurate fact-finding. "National courts, familiar with local conditions and possessing easy access to witnesses, can usually settle disputes more expeditiously and conveniently than international tribunals." Yale-Loehr, supra, at 358. Even in a case where local remedies ultimately prove inadequate, exhaustion may serve to refine the claims.
 
 B
 
 192
 Requiring exhaustion of local remedies will help to preserve our role in a government of separated powers. Strictly speaking, separation of powers principles do not require us to stay our jurisdiction while the parties exhaust their local remedies. But although the Constitution does not demand that we abstain, separation of powers principles should inform our prudential judgment concerning exhaustion. In many respects exhaustion resembles the doctrines of political question, comity, and act of state, all of which require respect for foreign governments and the political branches of our government and may insist that the courts decline jurisdiction in order to avoid interfering with sensitive foreign matters to which, if a U.S. response is required, the political branches must respond. See Maj. op. at 1079 (political question is a "function of the separation of powers"), 1084 ("The [act of state] doctrine reflects the concern that the judiciary . . . may interfere with the executive's conduct of American foreign policy."), 8965 ("Under the international comity doctrine, courts sometimes defer to the laws or interests of a foreign country and decline to exercise jurisdiction that is otherwise properly asserted."). As the Court explained with respect to the act-of-state doctrine:
 
 
 193
 We once viewed the doctrine as an expression of international law, resting upon the highest considerations of international comity and expediency. We have more recently described it, however, as a consequence of domestic separation of powers, reflecting the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder the conduct of foreign affairs.
 
 
 194
 W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., 493 U.S. 400, 404, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990) (internal quotation marks omitted).
 
 
 195
 Between the President and Congress, the political branches possess the plenary power of the United States to prosecute our interests abroad "by diplomacy, or, if need be, by war." United States v. Diekelman, 92 U.S. 520, 524, 23 L.Ed. 742 (1875); see United States v. Curtiss-Wright Exp. Corp., 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255 (1936) (the President is "the sole organ of the federal government in the field of international relations") (internal quotation marks omitted). "[T]he conduct of foreign relations is committed by the Constitution to the political departments of the Federal Government . . . [and] the propriety of the exercise of that power is not open to judicial inquiry," United States v. Pink, 315 U.S. 203, 222-23, 62 S.Ct. 552, 86 L.Ed. 796 (1942), because these are "decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility." Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948).
 
 
 196
 Mere recitation that the political branches are the organs of foreign policy does not resolve the separation of powers conundrum, however. Since the adoption of ATCA in Judiciary Act of 1789, we have been charged with providing a forum for aliens who have suffered injuries in violation of the law of nations. Deciding whether or not the exercise of jurisdiction will actually interfere with our foreign relations has been decided on a case-by-case basis, as the majority (and the district court before us) has done here. We may or may not be aided by the political branches in deciding whether to exercise jurisdiction, and we may or may not accede to requests from those branches. See Sosa, 542 U.S. at 733, 124 S.Ct. 2739; Alperin v. Vatican Bank, 410 F.3d 532, 555-57 (9th Cir.2005). But there can be little question since ATCA was revived in Filartiga that many actions that are brought under ATCA involve sensitive inquiries into the internal affairs of other countries. See Sosa, 542 U.S. at 733, 124 S.Ct. 2739 (noting pending cases which the government of South Africa claims interfere with its domestic policy); Mujica v. Occidental Petroleum Corp., 381 F.Supp.2d 1164 (C.D.Cal.2005) (dismissing, on political question grounds, ATCA claims alleging that the Columbian government worked with defendants to bomb plaintiffs' home town).
 
 
 197
 Without an exhaustion requirement, courts must depend on statements from the executive—based on its own factfinding and expertise—to decide whether we should exercise jurisdiction under ATCA. Where the U.S. State Department has weighed in, "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy." Sosa, 542 U.S. at 733 n. 21, 124 S.Ct. 2739. This is problematic because it is the judiciary, and not the executive, which has the responsibility to interpret ATCA. See generally Curtis A. Bradley, Chevron Deference and Foreign Affairs, 86 VA. L. REV. 649, 680 (2000) ("The executive branch, however, is not charged with administering the [ATCA]. Rather, the statute is a direct congressional regulation of federal court jurisdiction. As a result, there is no basis in the statute for presuming a delegation of lawmaking power to the executive branch."). This allows the executive to cast a case-by-case vote on an issue uniquely reserved to the court: the question of its own subject matter jurisdiction. Justice Powell commented on just how much confusion can result from this executive encroachment on justiciability. "I would be uncomfortable with a doctrine which would require the judiciary to receive the Executive's permission before invoking its jurisdiction. . . . Such a notion, in the name of the doctrine of separation of powers, seems to me to conflict with that very doctrine." First Nat'l City Bank v. Banco Nacional de Cuba, 406 U.S. 759, 773, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (Powell, J., concurring in the judgment); see id. (Douglas, J., concurring in the judgment) (worrying that executive interference would lead to arbitrary results as "the Court becomes a mere errand boy for the Executive Branch which may choose to pick some people's chestnuts from the fire, but not others'"). "Resolution of so fundamental [an] issue [as the basic division of functions between the Executive and the Judicial Branches]," Justice Brennan argued, "cannot vary from day to day with the shifting winds at the State Department. Today, we are told, [judicial review of a foreign act of state] does not conflict with the national interest. Tomorrow it may." Id. at 792-93, 92 S.Ct. 1808 (alterations in original) (Brennan, J., dissenting) (quoting Zschernig v. Miller, 389 U.S. 429, 443, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968) (Stewart, J., concurring)).
 
 
 198
 We have known such "shifting winds." In In re Estate of Marcos Human Rights Litigation, we faced the problem squarely:
 
 
 199
 the Department of Justice has changed its position on whether a plaintiff such as Trajano has a cause of action cognizable in federal court for a violation of international law condemning torture. . . . We do not read the executive branch's flip on this issue as signifying so much; its change of position in different cases and by different administrations is not a definitive statement by which we are bound on the limits of § 1350.
 
 
 200
 978 F.2d 493, 498-500 (9th Cir.1992), cert. denied, 508 U.S. 972, 113 S.Ct. 2960, 125 L.Ed.2d 661 (1993). More recently, we faced similar difficulties in the Unocal litigation. See Doe I v. Unocal, 395 F.3d 932 (9th Cir.2002), rehearing en banc granted, 395 F.3d 978 (9th Cir.2003). While the Clinton administration informed the court that the litigation would have no effect on U.S. foreign policy, the Bush administration claimed that it would. See Beth Stephens, Sosa v. Alvarez-Machain: "The Door Is Still Ajar" For Human Rights Litigation in U.S. Courts, 70 BROOKLYN L. REV. 533, 560-67 (2004). The point is not that the executive is unstable, or that our foreign policy shifts with every political wind, but that foreign relations is a notoriously fluid matter, subject to subtle changes in personnel, events, and perceptions on either side of our borders. Conduct of our foreign relations requires constant monitoring and adjustment.
 
 
 201
 As courts, we are not well situated to make such subtle adjustments in response to national and world events. We are, by design, insulated from ordinary political pressures. We rely on the parties to supply us the facts on which we base our decisions and have no means for gathering information essential to such decisions. See Curtiss-Wright, 299 U.S. at 320, 57 S.Ct. 216 (pointing out that as between Congress and the president, the president "has the better opportunity of knowing the conditions which prevail in foreign countries"). Actions brought under ATCA must necessarily involve reparations for past actions, not injunctive or other equitable relief for which we have no mechanism for enforcement outside our borders. Our tools for mediating disputes occurring outside of the physical boundaries of our jurisdiction are quite limited, and our remedies largely inadequate to reconcile political differences among the parties. "[I]nternational legal disputes are not as separable from politics as are domestic legal disputes," Justice Powell observed. First Nat'l City Bank, 406 U.S. at 775, 92 S.Ct. 1808 (Powell, J., concurring in the judgment). The Sosa Court thus recognized the principle of maintaining a "high bar" for international law claims, because the "potential implications for the foreign relations of the United States of recognizing such causes should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." Sosa, 542 U.S. at 727, 124 S.Ct. 2739.
 
 
 202
 Exhaustion will not prevent these problems. But by requiring parties to assure the court that they have pursued their local remedies before coming to our courts, exhaustion may sharpen the issues for us and for the executive and Congress; just as exhaustion may develop the record and aid our processes, it may likewise focus the political branches's vision as well. Where the litigant has never approached either a foreign or his own state through its courts or other processes, he cannot expect to receive local executive representation needed to bring about a diplomatic resolution. By short-circuiting his own system and going straight to foreign courts, the litigant deprives his home government of discretion in selecting a means to resolve the dispute. See RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 206 comment c (noting that sovereignty entitles states to apply law within their borders, and that it entitles states to choose to "pursue legal remedies for injury" including "the right to make diplomatic claims and to resort to arbitral or judicial tribunals."). Without an exhaustion rule, individual litigants can single-handedly derail diplomacy, forcing us to mediate an international dispute through a lawsuit for damages. International law has long recognized that exhaustion enables governments to protect themselves from the demands of individual litigants who seek to use international law to settle disputes better handled at home. The rule spares states "the intricate and possibly expensive and embarrassing business of sponsoring on the international plane the claims of its nationals which can be or could have been settled by less cumbersome machinery" and it allows government officials to protect national interests in using diplomacy because it affords them "closer control over relations with the foreign state concerned." Mummery, supra, at 392-93.
 
 C
 
 203
 The dispute before us is a textbook case for exhaustion. The record is replete with contradictory warnings, misdirection, and diplomatic speak. We have conflicting statements from the government of PNG, the latest following a change in the administration. The most recent communique (unauthenticated) advises us that PNG's relations with the United States will be adversely affected unless we accept jurisdiction of this case. PNG's near-threat may itself represent a political judgment rather than a jurisdictional fact, reflecting the new government's interest in having someone else solve its internal problems. We have a cryptic Statement of Interest from the State Department, suggesting that the United States probably has a problem with our exercising jurisdiction— but it may not. When the district court asked for clarification, the State Department responded that it stood by its prior ambiguous statement. The parties have no evident connection to the United States. The plaintiffs-Bougainvilleans are largely PNG residents; the defendant is a multinational corporation, apparently out of Great Britain but with strong ties to Australia. The issues are complex and will require mustering facts that are anywhere from ten to forty years old and likely ascertainable only in PNG, thousands of miles from the Central District of California, where the complaint was filed. Although the defendant is a private corporation, the complaint alleges the complicity of a prior PNG government, actions by the PNG armed forces, and a history of internal ethnic and political strife.
 
 
 204
 Even from our limited vantage point, it is far from clear that sending these parties home to pursue their local remedies first will solve this matter without our mediation. But is well worth the effort. If it does not succeed, the plaintiffs may renew their action in our courts and, judging from our experience with domestic exhaustion, in the long run we will all be better off for it.
 
 V
 
 205
 I would affirm the judgment of the district court dismissing this suit, but I would do so without prejudice to refiling the suit after the plaintiffs have exhausted their local remedies. I would thus not reach any of the issues addressed by the majority because I regard them as premature, and I express no opinion on the majority's resolution of those questions.
 
 
 206
 I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 This is a case of first impression in this circuit. We have not addressed the application ofSosa to exhaustion. The only issue before us in Alperin v. Vatican Bank, 410 F.3d 532 (9th Cir.2005), cited by the majority at 1089, was whether that case should be dismissed under the political question doctrine. See id. at 538, 541 n. 4 ("by agreement of the parties the district court limited its discussion to the issue of whether the Holocaust Survivors' claims should be dismissed under the political question doctrine," and the "viability of the Holocaust Survivors' claims apart from the issue of the political question doctrine is not before us"). We left open the possibility of other grounds for dismissal, and opined that "[g]iven . . . a myriad of other procedural and jurisdictional hurdles, the Holocaust Survivors may indeed face an uphill battle in pursuing their claims." Id. at 539.
 
 
 [2]
 Statutorily required exhaustion, by contrast, may be jurisdictionalSee Weinberger v. Salfi, 422 U.S. 749, 764-67, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); Marathon Oil Co. v. United States, 807 F.2d 759, 768 (9th Cir. 1986); Montgomery v. Rumsfeld, 572 F.2d 250, 252 (9th Cir.1978).
 
 
 [3]
 In its entirety, ATCA provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350
 
 
 [4]
 The majority responds that remedies for torture are only narrowed if aliens can no longer bring a claim for torture under ATCA. Maj. op. at 1093-94 n.26. The Seventh Circuit has so heldEnahoro, 408 F.3d at 884-85, 886 (holding that torture claims are precluded now that TVPA "occup[ies] the field" and finding it "hard to imagine that the Sosa Court would approve of common law claims based on torture and extrajudicial killing when Congress has specifically provided a cause of action for those violations and has set out how those claims must proceed"). My point is a little different: If the majority is correct, Congress has made it more difficult for aliens to bring torture claims into U.S. courts because now (under TVPA) they must first exhaust their remedies, whereas previously (under ATCA) they did not.
 
 
 [5]
 I can only speculate as to why Congress chose not to clarify ATCA when it drafted the exhaustion provisions of TVPA. It may be that because TVPA extended the cause of action to United States citizens, Congress wished to make clear that traditional exhaustion would also apply to citizens suing in their own national courts
 
 
 [6]
 Judge Cudahy ultimately concluded thatSosa offered "little guidance" on the question and that is was "far from clear" whether exhaustion was required under ATCA. 408 F.3d at 890 (Cudahy, J., dissenting).
 
 
 [7]
 The majority argues that becauseSosa urges caution in expanding the causes of action available under ATCA, judicial caution precludes recognition of exhaustion. Maj. op. at 1095 (citing Sosa's directive that "[t]hese reasons argue for great caution in adapting the law of nations to private rights"). This turns the Court's reasoning on its head; the majority's conception of caution would expand, rather that restrict, the availability of claims under ATCA. It overlooks the Court's "reasons" for caution, which include the fear that courts might "consider suits under rules that would go so far as to claim a limit on the power of foreign governments over their own citizens," and "raise risks of adverse foreign policy consequences." 542 U.S. at 727, 728, 124 S.Ct. 2739. An exhaustion requirement would help abate such fears and would serve to fortify the "high bar" Sosa established for ATCA claims. Id. at 727, 124 S.Ct. 2739.
 
 
 [8]
 The exhaustion requirement predates both the Jay Treaty and ATCA. "The requirement that local remedies should be resorted to seems to have been recognized in the early history of Europe, before the modern national state had been born. . . ." AMERASINGHE,supra, at 22; see also A.A. CANCADO TRINDADE, THE APPLICATION OF THE RULE OF EXHAUSTION OF LOCAL REMEDIES IN INTERNATIONAL LAW 1 (1983); A.A. Cançado Trindade, Origin and Historical Development of the Rule of Exhaustion of Local Remedies in International Law, 12 REVUE BELGE DE DROIT INTERNATIONAL 499, 507, 512 (1976) (noting that "the practice of States throughout the eighteenth century was clearly directed towards upholding the local remedies rule"). For reasons that I explain, infra, it reads too much into ATCA to assume that because the Senate and the President approved the Jay Treaty with an express exhaustion requirement, the House and Senate, five years earlier, could not have anticipated an exhaustion requirement in ATCA. But see Maj. op. at 1091 ("the explicit exhaustion requirement in the Jay Treaty may reveal that the First Congress did not view exhaustion as an automatic rule of customary international law").
 
 
 [9]
 Like its U.S. domestic counterpart, the rule of exhaustion of local remedies is largely judge-made. "[P]erhaps more so than any other rule of international law," it "undoubtedly grew up under the nurturing of professional administrators." Mummery,supra, at 393. The law continues to be "sheltered from the harsher political winds" that shape much of international law because its development rests in the hands of judges. Id.
 
 
 [10]
 The matter is by no means resolved. There was a trend towards the procedural view at the time ofPhosphates in Morocco (Italy v. Fr.), 1938 P.C.I.J. (ser.A/B) No. 74, but the International Law Commission adopted the substantive view in the 1970s. See Maj. op. at 1097; Second Report on Diplomatic Protection, supra ¶ 35-37. The International Law Commission's current draft articles currently stop short of declaring when international responsibility attaches, but declare that "The responsibility of a State may not be invoked if . . . [t]he claim is one to which the rule of exhaustion of local remedies applies and any available and effective local remedy has not been exhausted." Responsibility of States for Internationally Wrongful Acts, Art. 44, 2001 in Official Records of the General Assembly, Fifty-sixth Session, Supplement No. 10 (A/56/10). The current Third Restatement takes no position on the issue; it has relinquished even the noncommittal stance of the Second Restatement, which declared that "the exhaustion of available remedies is primarily a procedural requirement." RESTATEMENT (SECOND) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 206 comment d (1965) (emphasis added).
 
 
 [11]
 I believe thatSosa's rule would incorporate even procedural exhaustion, because the international community does not recognize virtually any "violation of the law of nations" without it. Contrary to the majority's opinion, the Sosa rule is not limited to "substantive norms comparable to `violation of safe conducts, infringement of the rights of ambassadors, and piracy,'" Maj. op. at 1097 (quoting Sosa, 542 U.S. at 724, 124 S.Ct. 2739), but requires recognition of "any claim based on the present-day law of nations [that] rest[s] on a norm of international character accepted by the civilized world and defined with specificity comparable to the features of the 18th-century paradigms we have recognized." Sosa, 542 U.S. at 725, 124 S.Ct. 2739.
 
 
 [12]
 Judicial inquiry into available exceptions in ATCA cases would be similar to that performed when applying the doctrine of forum non conveniens,see Menendez Rodriguez v. Pan American Life Insurance Co., 311 F.2d 429, 433 (5th Cir.1962) (finding that political refugees could receive a fair hearing in Cuba), vacated on other grounds, 376 U.S. 779, 84 S.Ct. 1130, 12 L.Ed.2d 82 (1964), or considering the enforceability of a forum selection clause, see McDonnell Douglas Corp. v. Islamic Republic of Iran, 758 F.2d 341, 346 (8th Cir.1985) (refusing to consider enforcement of a forum selection clause where litigation in Iran would "be so gravely difficult and inconvenient that McDonnell Douglas would for all practicable purposes be deprived of its day in court").
 
 
 [13]
 I have deliberately refrained from referring to comity between federal courts and foreign courts, because I do not wish to prejudge what form local remedies might take. As I discussinfra, at 1117 n. 16, we have only to look at South Africa's Truth and Reconciliation Commission to see that some countries may be able to craft unique institutions for dealing with difficult internal matters. Not every solution requires a judicial solution. Indeed, governments have much greater flexibility in terms of process and remedies than American courts may be able to offer.
 
 
 [14]
 The majority observes that hearing exhausted cases presents the same potential for undermining local governments. Maj. op. at 1098 n. 31. While this is true, it misses the point. If we respect the international norm requiring exhaustion, we will minimize the number cases that involve potential meddling in other country's affairs. In fact, we will intervene only where governments are so inadequate as not to provide adequate remedies. With exhaustion, we get the best of both worlds. We retain a commitment to the principle of international comity, while stepping in to render justice where required— and only where required. While adjudicating the exhaustion requirement requires occasional inquiries into the internal affairs of other nations (in cases where the adequacy of remedies is not readily apparent),id., this infrequent inquiry is preferable to offering international intervention on behalf of every foreign plaintiff who shops a claim in American courts.
 
 
 [15]
 The majority complains about the lack of "empirical data showing improvements in the quality or accessibility of local remedies as a result of the application of the local remedies rule." Maj. op. at 1098. A study of this scope would indeed be difficult to complete— since cases like the one before us are rare. We need not obtain proof of the exhaustion's effectiveness beyond a reasonable doubt before considering scholars' arguments and case studies as part of our prudential inquiry. That said, there are convincing empirical examples,see infra, 1117 n. 16. These examples fall short of quantifying "the full effects of human rights treaties," Maj. op. at 1098, but they strongly indicate exhaustion helps foster local remedies, while preserving international litigation for those "individuals whose access to justice is blocked in their home country." Ellen Lutz & Kathryn Sikkink, The Justice Cascade: The Evolution and Impact of Human Right Trials in Latin America, 2 CHI. J. INT'L L. 1, 4 (2001). And even if I believed that the academic empirical debate was a draw, I would defer to Congress's observation that exhaustion "can be expected to encourage the development of meaningful remedies in other countries." H.R. REP. No. 102-367, pt. 3, at 5, reprinted in 1992 U.S.C.C.A.N. 84, 88-89, and the State Department's decision, in the case of South Africa, that foreign litigation over reparations for apartheid interfered with that nation's domestic development. See In re S. Afr. Apartheid Litig., 346 F.Supp.2d 538, 553 (S.D.N.Y.2004).
 
 
 [16]
 Failure to exhaust threatens international institutions, not just local ones. Most claims brought under ATCA could have been brought in an international forum—one that most likely requires exhaustion. Allowing claims to be brought in United States courts before efforts at a local solution allows litigants to forum shop and discourages them from seeking adjudication in international bodiesSee Curtis A. Bradley, The Costs of International Human Rights Litigation, 2 CHI. J. INT'L L. 457, 469 (2001) (arguing that alien tort actions are costly to the international system because they risk preempting or disrupting local remedies or international institutional responses).
 
 
 [17]
 One trend we have seen in recent years is the development of creative, indigenous legal solutions to address alleged human rights violations
 [T]he transition from autocratic rule to democracy in numerous countries, beginning in South America but extending to Eastern Europe and parts of Africa, Central America, and Asia, has caused new governments to devise strategies for coming to terms with the human rights abuses of prior regimes and, in some cases, guerrilla opposition groups. In most cases in which states have decided to seek accountability, they have charted their own course under domestic law, creating mechanisms tailored to their individual circumstances. This pattern has led to criminal trials, truth commissions, purging of former officials from office, and civil suits against abusers. Steven R. Ratner, New Democracies, Old Atrocities: An Inquiry In International Law, 87 GEO. L.J. 707, 714 (1999). We can see evidence of these local solutions most prominently in South Africa, with the creation of the Truth and Reconciliation Commission to address the injustices of apartheid, see Schrage, supra, at 166, and most recently in Rwanda, with the development of an alternative dispute resolution method known as gacaca courts, which emphasize the admission of guilt and expression of remorse by defendants complicit in the Rwandan genocide, see William A. Schabas, Genocide Trials and Gacaca Courts, 3 J.INT'L CRIM. JUST. 879 (2005).